**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

FATHY M.A. SALEH; GODWIN O.
MBAGWU,

        *Plaintiffs-Appellees,*

        v.

JANESHWAR UPADHYAY,

        *Plaintiff,*

        v.

EDDIE MOORE, JR., in his individual
capacity and in his official capacity
as President of Virginia State
University; MARTHA DAWSON, in her
individual capacity and in her
official capacity as Provost of
Virginia State University; LORENZA
W. LYONS, in his individual capacity
and in his official capacity as Dean
of the School of Agriculture,
Science and Technology of Virginia
State University; FLORENCE S.
FARLEY, in her individual capacity
and in her official capacity as
Professor of Virginia State
University; THOMAS H. EPPS, in his
individual capacity and in his
official capacity as Chairperson of
the Department of Chemistry,
Director of the MBRS Program and
Associate Professor at Virginia
State University,

        *Defendants-Appellants,*

        and

No. 99-2137

Virginia State University; Gerald Z. Demers, in his individual capacity and in his official capacity as Chair of the Department of Engineering Technology of Virginia State University; Edward J. Mazur, in his individual capacity and in his official capacity as Vice President of Administration, Business and Finance of Virginia State University; Richard Booker, in his individual capacity and in his official capacity as Director of Extension Services of Virginia State University; Regina Knight Mason, in her individual capacity and in her official capacity as Assistant Professor at Virginia State University and in her individual capacity and her official capacity as Interim Chairperson of the Department of Life Sciences at Virginia State University; Winfrey S. Clarke, in his individual capacity and in his official capacity as Associate Dean for Agriculture and Director of Research of the School of Agriculture, Science and Technology of Virginia State University,

*Defendants.*

FATHY M.A. SALEH,
                    *Plaintiff-Appellant,*

        and

GODWIN O. MBAGWU; JANESHWAR
UPADHYAY,

                    *Plaintiffs,*

                v.

EDDIE MOORE, JR., in his individual
capacity and in his official capacity
as President of Virginia State
University; MARTHA DAWSON, in her
individual capacity and in her
official capacity as Provost of
Virginia State University; LORENZA
W. LYONS, in his individual capacity        No. 99-2188
and in his official capacity as Dean
of the School of Agriculture,
Science and Technology of Virginia
State University; FLORENCE S.
FARLEY, in her individual capacity
and in her official capacity as
Professor of Virginia State
University;

                    *Defendants-Appellees,*

        and

VIRGINIA STATE UNIVERSITY; THOMAS
H. EPPS, in his individual capacity
and in his official capacity as
Chairperson of the Department of
Chemistry, Director of the MBRS

Program and Associate Professor at Virginia State University; Gerald Z. Demers, in his individual capacity and in his official capacity as Chair of the Department of Engineering Technology of Virginia State University; Edward J. Mazur, in his individual capacity and in his official capacity as Vice President of Administration, Business and Finance of Virginia State University; Richard Booker, in his individual capacity and in his official capacity as Director of Extension Services of Virginia State University; Regina Knight Mason, in her individual capacity and in her official capacity as Assistant Professor at Virginia State University and in her individual capacity and her official capacity as Interim Chairperson of the Department of Life Sciences at Virginia State University; Winfrey S. Clarke, in his individual capacity and in his official capacity as Associate Dean for Agriculture and Director of Research of the School of Agriculture, Science and Technology of Virginia State University,

*Defendants.*

FATHY M.A. SALEH; GODWIN O.
MBAGWU,

*Plaintiffs-Appellees,*

and

JANESHWAR UPADHYAY,

*Plaintiff,*

v.

EDDIE MOORE, JR., in his individual
capacity and in his official capacity
as President of Virginia State
University; MARTHA DAWSON, in her
individual capacity and in her
official capacity as Provost of
Virginia State University; LORENZA
W. LYONS, in his individual capacity
and in his official capacity as Dean
of the School of Agriculture,
Science and Technology of Virginia
State University; FLORENCE S.
FARLEY, in her individual capacity
and in her official capacity as
Professor of Virginia State
University; THOMAS H. EPPS, in his
individual capacity and in his
official capacity as Chairperson of
the Department of Chemistry,
Director of the MBRS Program and
Associate Professor at Virginia
State University,

*Defendants-Appellants,*

and

No. 00-1744

VIRGINIA STATE UNIVERSITY; GERALD
Z. DEMERS, in his individual
capacity and in his official capacity
as Chair of the Department of
Engineering Technology of Virginia
State University; EDWARD J. MAZUR,
in his individual capacity and in his
official capacity as Vice President
of Administration, Business and
Finance of Virginia State
University; RICHARD BOOKER, in his
individual capacity and in his
official capacity as Director of
Extension Services of Virginia State
University; REGINA KNIGHT MASON,
in her individual capacity and in her
official capacity as Assistant
Professor at Virginia State
University and in her individual
capacity and her official capacity as
Interim Chairperson of the
Department of Life Sciences at
Virginia State University; WINFREY
S. CLARKE, in his individual
capacity and in his official capacity
as Associate Dean for Agriculture
and Director of Research of the
School of Agriculture, Science and
Technology of Virginia State
University,
                                           *Defendants.*

Appeals from the United States District Court
for the Eastern District of Virginia at Richmond.
Robert E. Payne, District Judge.
(CA-97-460)

Argued: November 2, 2000

Decided: May 31, 2001

Before WIDENER and KING, Circuit Judges, and
Margaret B. SEYMOUR, United States District Judge for the
District of South Carolina, sitting by designation.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Bradley Brent Cavedo, SHUFORD, RUBIN & GIBNEY,
P.C., Richmond, Virginia, for Appellants. Samuel M. Brock, III,
MAYS & VALENTINE, L.L.P., Richmond, Virginia, for Appellees.
**ON BRIEF:** Robert A. Dybing, SHUFORD, RUBIN & GIBNEY,
P.C., Richmond, Virginia, for Appellants. James S. Crockett, Jr.,
Richard F. Hawkins, III, MAYS & VALENTINE, L.L.P., Richmond,
Virginia; Beverly C. Powell, Mark E. Herrmann, EURE, KINCER &
BELL, P.C., Richmond, Virginia, for Appellees.

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

## OPINION

PER CURIAM:

These appeals were consolidated for oral argument pursuant to
U.S. Ct. of App. 4th Cir. Rule 12(b). Appeals Nos. 99-2137 and 99-
2188 XAP involve the merits of the underlying employment discrimi-
nation actions. Appeal No. 00-1744 involves the issue of attorneys'
fees. We address the appeals on the merits first, since our disposition

of the issues presented influences our determination of the appropriate award of attorneys' fees.

## I.

Appellees Fathy M. A. Saleh (Saleh) and Godwin O. Mbagwu (Mbagwu) (together "Appellees"), tenured professors at Virginia State University (VSU), brought employment discrimination actions against several VSU administrators, including the University President and Provost, in their individual capacities. Both Saleh and Mbagwu alleged race and national origin discrimination under 42 U.S.C. §§ 1981 and 1983, conspiracy to interfere with their civil rights under 42 U.S.C. § 1985, and state law claims for conspiracy to injure them in their reputation, trade, business, or profession under Va. Code Ann. §§ 18.2-499 & 500. Saleh also alleged retaliation for the exercise of First Amendment Rights under 42 U.S.C. § 1983, state law claims for tortious interference with contracts allegedly inuring to his benefit, and defamation. Appellees claimed that, because of their race and national origin, they were given lower annual evaluations and correspondingly lower annual raises from 1994 to 1998, and were denied other professional opportunities incident to their employment at VSU.[1]

The cases were consolidated by the district court for discovery and trial. Appellants Eddie N. Moore, Jr. (Moore), President of VSU; Dr. Martha Dawson (Dawson), University Provost; Lorenza W. Lyons (Lyons), Dean of VSU's School of Agriculture, Science and Technology; Dr. Florence S. Farley (Farley), Professor of Psychology; and Dr. Thomas H. Epps (Epps), Chairperson of the Chemistry Department, each moved for summary judgment as to all of Appellees' claims.[2]

---

[1]Two other VSU professors brought related claims against VSU administrators; however, their claims are not a part of this appeal.

[2]Farley was named as a defendant in Saleh's case only. Epps was named as a defendant in Mbagwu's case only. Both Saleh and Mbagwu sued Moore, Dawson, and Lyons. Saleh named three other VSU administrators as defendants: Gerald Z. Demers, Chairperson of the Department of Engineering Technology; Edward Mazur, Vice President of Administration, Business and Finance; and Richard Booker, Director of Extension Services. The district court granted the summary judgment motions of Mazur and Booker and dismissed them as defendants. Saleh's discrimination and retaliation claims against Demers were presented to the jury and a verdict was returned in Demers' favor.

The district court granted summary judgment as to Appellees' conspiracy claims under federal and state law, as to Saleh's tortious interference and defamation claims, and as to Mbagwu's race discrimination claims. The district court denied summary judgment as to the national origin discrimination claims under § 1983 and as to Saleh's race discrimination and retaliation claims under § 1983. The district court determined that the underlying factual allegations were subject to Virginia's two-year statute of limitations. However, the district court found that evidence respecting the time-barred allegations was relevant to prove discriminatory intent as to the claims surviving summary judgment.

The matter was tried before a jury. The jury rejected Saleh's national origin and racial discrimination claims, but found that Moore, Dawson, Lyons, and Farley had retaliated against him. The jury awarded Saleh $97,769.00 in compensatory damages and $19,580.00 in punitive damages. In Mbagwu's case, the jury found that Moore, Dawson, Lyons, and Epps had discriminated against Mbagwu on the basis of his national origin. The jury awarded Mbagwu $194,829.00 in compensatory damages and $35,714.00 in punitive damages.

Appellants moved at the conclusion of trial for judgment as a matter of law in both cases, as well as for a new trial and for a new trial nisi remittitur in both cases. The district court denied Appellants' post-trial motions. They now appeal the denial of their motions for judgment as a matter of law and for a new trial. In addition, Appellants except to the compensatory damages awarded in both cases as excessive. Finally, Appellants argue that the district court committed reversible error in admitting Plaintiff's Exhibit No. 395, a chart that summarized faculty hiring practices at VSU. On cross-appeal, Saleh argues that the district court erred in granting summary judgment on his claims for conspiracy to injure another in his business or profession, and for tortious interference with his alleged contracts.

II.

In April 1993, the Auditor of Public Accounts of the Commonwealth of Virginia reported to the VSU Board of Visitors (BOV) that VSU's finances were in disarray. The BOV elected Moore, then Trea-

surer of the Commonwealth of Virginia, to be President of VSU, and assigned him the task of reforming VSU's finances. Moore hired Dawson as University Provost, and appointed Lyons as Dean of VSU's School of Agriculture, Science and Technology (AST School). Moore, Dawson, and Lyons are African-American.

Shortly after Moore's election as VSU President, the Virginia General Assembly issued a "restructuring" mandate to all state-sponsored academic institutions in the Commonwealth. The restructuring process required state-sponsored colleges and universities to eliminate wasteful expenditures of taxpayer money.

As part of the state mandated restructuring process, VSU implemented a new faculty evaluation process known as "pay for performance" to establish faculty members' annual raises. Under the pay for performance guidelines, VSU faculty are rated in three categories: teaching, research, and service to VSU. Faculty are rated either "unsatisfactory," "satisfactory," "noteworthy," or "outstanding" in each category. Until 1998, the department chair averaged these ratings into an overall rating and then recommended a pay raise from an increment range prescribed by the pay for performance guidelines. For example, in 1995, a faculty member receiving an overall rating of "satisfactory" could receive a raise of between one and one-half and two percent, at the discretion of the department chair. In 1998, the system was changed so that all persons receiving the same overall rating received the same pay raise.

A.

Saleh was born in Egypt in 1949 and moved to the United States in 1976. He is of North African racial and ethnic origin. Before working at VSU, Saleh was a tenured professor and the Director of the Center for Energy and Environmental Studies at Southern University in Baton Rouge, Louisiana. In 1989, VSU president Dr. Wesley McClure invited Saleh to VSU to establish a similar center there. Saleh accepted a tenured position as an associate professor in VSU's Department of Agriculture; however, Saleh was not required to teach classes, since his planned role at VSU was to establish a research facility.

Moore reorganized and restructured VSU, among other ways, by eliminating several centers at VSU and by requiring all faculty to teach. In a letter dated April 6, 1994, Lyons informed Saleh:

> [Y]our new contract will be a full-time teaching appointment within the Department of Engineering Technology [in the AST School]. There will not be any state funding available to support the Center for Energy and Environmental Studies, effective May 15, 1994. By a copy of this letter to Dr. Martha Dawson . . . I am recommending that all of your new initiatives relate to your area of expertise and be consistent with the goals and objectives of the Department of Engineering Technology.

In April 1994, Moore mailed Saleh a contract for the upcoming 1994-95 school year that described Saleh as "Associate, Engineering Technology." Saleh changed the contract by typing in the words "Professor of Environmental Engineering, Center for Energy and Environmental Studies," and sent the contract to Lyons. By letter dated December 9, 1994, Lyons provided Saleh with a list of courses he was expected to teach in Spring 1995, and requested that Saleh contact Gerald Z. Demers (Demers), the Chair of the Department of Engineering Technology. Saleh testified that he did not receive this letter until the middle of January 1995. In any event, Saleh did not assume his teaching load at the start of the spring semester. Dawson wrote Saleh in February 1995, after the spring term had started, threatening him with termination if he failed to assume his teaching duties. Saleh eventually agreed to teach one class for the remainder of the semester.

On July 6, 1995, Saleh and Carey Stronach (Stronach), a white American Physics professor at VSU, presented a paper entitled "Recent Acts of Racial Discrimination Against White and Foreign-National Faculty and Academic Staff at Virginia State University" ("Recent Acts") at a BOV meeting attended by Moore and Dawson. The document listed alleged acts of discrimination against white and foreign-born VSU faculty; almost all were alleged to have been directed by Dawson and Lyons. The document was unsigned; however, Saleh and Stronach discussed and concurred with its allegations at the BOV meeting.

Approximately fifteen minutes after this presentation, Saleh was instructed to report to Dawson's office. Dawson informed Saleh that she intended to sue him for defamation for the "lies" contained in "Recent Acts." According to Saleh, she also told him, "you and your friends are going to be reprimanded, you will never do research again."

The presentation of "Recent Acts" was discussed at a July 12, 1995 meeting of the VSU Faculty Council, a body that presents the official opinion of the faculty on policy matters. A transcript of that meeting reveals the following discussion:

> Farley: If the name is Salla [sic], I know how Salla got here. Salla has tenure and nobody knows that the tenure ever went to the Board of Visitors. We have yet to find it. I was Interim Dean when he came . . . . And if I go under my bed in some boxes, I'm going to find a copy of the A21 [personnel action form]. That was not signed by the Vice President of Academic Affairs, because I keep everything for this kind of day.

> See but that's the way he came. He came with his rank and he came with tenure. He walked in the door with tenure, and nobody in the Ag department acted on it. And it's my understanding that as of Monday morning they can find no Board minutes that said that he was given tenure by the Board of Visitors.

> Counsel [sic] member: But then he doesn't have tenure.

> Farley: As far as I'm concerned he doesn't have tenure. As far as I'm concerned, he doesn't have tenure.

Moore subsequently reported to the BOV that, in his opinion, Saleh had been hired in a manner inconsistent with VSU policy. The board determined, however, that Saleh had tenure. Moore purportedly told Saleh in December 1995, "you make me work hard for you, I have to check your file. You don't have tenure. And I went to the board and the board wouldn't let me take your tenure."

Saleh testified that in October 1995 he entered into a consulting contract with Resources Group of Virginia (RGV), an agricultural business venture, although no contract was ever produced at trial. Raymond Golden, who formed RGV, testified that financial support for the project was contingent on his ability to obtain technical assistance from VSU's Cooperative Extension Service, headed by Richard Booker. Golden testified that Booker told him over the telephone that the Extension Service could not work with RGV "because Dr. Saleh and Eddie Moore had a problem," and told him in person that "Eddie Moore didn't like Dr. Saleh and he could not work with me." Booker denied making these statements, however. Another witness, Bernard Jones, testified that, in the fall of 1995, Booker "said that I was going to find myself in trouble hanging out with Dr. Saleh." In any event, the RGV project never materialized.

In late October 1995, Demers evaluated Saleh's performance for the period beginning January 1, 1995 and ending August 30, 1995. Demers gave Saleh an overall rating of "unsatisfactory" and recommended no raise, citing Saleh's failure to assume his teaching responsibilities at the beginning of the semester. Saleh objected to this evaluation, arguing that his failure to assume his teaching responsibilities was due to the confusion resulting from his transfer to the Department of Engineering Technology. At Dawson's direction, Demers changed the rating to "satisfactory," and recommended a one and one-half percent raise. Saleh continued to object to this evaluation, arguing he merited an overall rating of at least "noteworthy." Demers refused to change the rating further, and explained this refusal by telling Saleh that he perceived an "aura" surrounding Saleh. This "aura," Demers acknowledged at trial, stemmed from the fact that Lyons and Dawson were unhappy with Saleh.

There was evidence that Demers felt Saleh was not at fault for failing to assume a teaching load. In a letter to Lyons dated November 15, 1995, Demers wrote,

> Dr. Saleh, according to documentation I have, was officially assigned to this department in February 1995. All other information to the contrary was verbal and subject to much on-going discussion and controversy between Dr. Saleh and the administration.

In the same letter, Demers reflected on his qualification to complete the 1995 evaluation of Saleh. He wrote: "I was placed in a position of rating a faculty member while probably being the least informed person to do so. That makes me very uncomfortable!" There was evidence that Demers felt constrained by Lyons and Dawson from giving Saleh an overall rating higher than "satisfactory," as he wrote to Saleh on this subject, "I'm damned if I do and I'm damned if I don't! . . . From where I sit, it's a no win situation for me . . . ."

In December 1995, Saleh presented a research proposal that provided for a program through which high school students would study engineering at VSU during the summer. Lyons rejected this proposal on the ground that it would compete with a similar program already underway.

In May 1996, Saleh submitted a "Departmental Request for Personnel Action" form, or "A21," requesting $19,750.00 in compensation for summer employment on a grant project. Lyons determined that the compensation requested exceeded that authorized by VSU policies, and unilaterally reduced the compensation requested to $13,520.00 before approving the form. When he received a check for the smaller amount, Saleh complained to Lyons, who referred the matter to Moore. Moore instructed VSU internal auditor Jack Spooner to conduct an investigation and prepare a report of his findings. Based on his own review of applicable university, state, and federal policies, Spooner concluded that Saleh had been overpaid for summer work in the amount of $5,794.00, and that Saleh had committed a fraud by failing to report the overpayment. Spooner also concluded that six other faculty members had received overpayments in the 1995-96 academic year. Moore reported Saleh's alleged fraud to state law enforcement officials and subsequently wrote Saleh to demand repayment of the $5,794.00 overage. No other faculty member identified by Spooner as having received an overpayment was reported to state police or asked by Moore to repay any money to VSU.

In September 1996, Saleh presented to Demers and Lyons a research grant proposal relating to a Natural Resources Research Institute (NRRI) project funded by the United States Agriculture Department (USDA). Lyons rejected this proposal on the ground that

projects related to Agriculture could not be conducted in the Engineering Technology Department.

In November 1996, Demers rated Saleh for the 1995-96 academic year, awarding an overall rating of "satisfactory" and recommending a two percent raise, which was approved by Lyons. Saleh's was the lowest raise in his department. When Demers was asked at trial whether the "aura" he had referred to had disappeared when it came time to complete the 1996 evaluations, Demers answered, "not that I could tell."

In November 1997, Saleh was evaluated by Demers' replacement, Kenneth Burbank (Burbank), for the 1996-97 academic year. Burbank gave Saleh an overall rating of "satisfactory" and recommended a raise of three percent, which was approved by Lyons. This raise was also the lowest in the department. On the evaluation form, Burbank commented,

> Dr. Saleh is a "square peg in a round hole." He is very talented and has great energy. However, his expertise and interest lie outside the goals and objectives of this Dept. His strained personal relationships with some of the people on campus limited his effectiveness to teach and to complete tasks.

Saleh asserts that, when he met with Burbank to object to this evaluation and corresponding raise, Burbank told him, "off the record . . . you need to get a job somewhere else. It's not worth it . . . you know you have sued the administration . . . . They hate you. You are a thorn in Dr. Lyon's side."

In 1998, Saleh received an overall rating of "satisfactory" and the fixed raise for that rating. This was also the lowest raise given in the department.

### B.

Mbagwu was born in Nigeria in 1936 and came to the United States in 1977 to study chemistry at VSU. He is of African descent.

Epps, Chair of VSU's Chemistry Department, hired Mbagwu as a chemistry instructor in 1981. Epps is African-American. Mbagwu attained tenure as a full professor at VSU in 1995. He is well-respected in his field for his prodigious accomplishments in the field of cancer research.

At trial, Mbagwu endeavored to convince the jury that the orders to discriminate against white and foreign-born faculty at VSU were part of Moore's "vision" for VSU. Mbagwu presented evidence that Moore and Farley harbored a discriminatory animus towards white and foreign-born VSU faculty. Several witnesses testified that they heard Moore and Farley make discriminatory remarks about white and foreign born faculty. Dr. Jean Cobbs (Cobbs), a former chair of the Sociology Department, testified that Moore told her after he was elected VSU president that "there were too many foreigners in Life Sciences, and he planned to do something about that." Cobbs also testified that at a BOV meeting she overheard Farley refer to another board member as "that white bitch." Stronach testified that he heard Farley refer to a foreign-born VSU professor as "some of that African trash that Benepal [another department chair] brought over here." Another witness testified that Farley referred to Saleh as "that Egyptian that McClure brought here." Saleh and Florence Siddiqi, the wife of Dr. Shaukat Siddiqi (Siddiqi), a Life Sciences professor and former plaintiff in this lawsuit, both testified about a conversation between Moore and Mary Usry (Usry), a BOV member, at a Christmas party at Saleh's house. Usry had written to Moore requesting information related to various administrative actions during his tenure as president. According to Saleh and Mrs. Siddiqi, Usry reported at the party that Moore had told her he "had a problem with the number of foreign faculty at Virginia State" because foreign faculty "could not relate with our students."

There was also evidence that Moore desired to appease Farley, who was a former dean, department chair, and mayor of Petersburg. Siddiqi testified that Moore told him and his wife over dinner that he "knows Dr. Farley, and he will do anything for her not to destroy his presidency as she did several other[s] before him." According to Mrs. Siddiqi, Moore stated he had heard that Dr. Farley "had been instrumental in other presidential administrations failing and . . . [that] [h]e'd be damned if she would do it to him or his administration."

When Moore arrived at VSU in 1993, Mbagwu was designing a grant proposal in the field of cancer research, to be funded by the National Institute of Health (NIH). The proposal included extra compensation in the amount of $3,541.00, to be split between Mbagwu and another faculty member for their work on the grant. The proposal was due at the NIH office in Bethesda, Maryland by 5:00 p.m. on October 1, 1993. Mbagwu delivered the proposal to the VSU Office of Grants and Contracts around the middle of September 1993. On Monday, September 27, the Director of that office, George Byrd, told Mbagwu that Moore would not sign the proposal because of the extra compensation included. Moore did not meet with Mbagwu to discuss the proposal until noon on October 1, 1993, and this meeting lasted almost three hours. Finally, Moore signed the grant proposal, backdating his signature to September 29, 1993. Mbagwu drove the documents to Bethesda, but was unable to reach the NIH office before it closed. The proposal was not accepted.

Also in the fall of 1993, Mbagwu applied for a position advertised by the VSU administration as "Associate Dean of Science and Technology." A search committee interviewed applicants for the position and selected Mbagwu and Stronach as the most qualified candidates. After the committee informed Lyons of its recommendations, however, he announced that there was no longer funding available for the position. Lyons then requested permission from Dawson to appoint Physics Professor Dr. James Davenport, who is African-American, to the position of "Assistant to the Dean" of the AST School. Davenport worked one semester in this capacity without compensation. However, he received twenty-five percent release time the following semester, and eventually received a twelve month contract at this position.

In December 1994, Epps and Lyons nominated Mbagwu for the "Giants in Science Award" for the 1994-95 academic year; Mbagwu later was selected as the recipient of the award. In November 1995, Epps, Lyons, Dawson, and President Moore nominated Mbagwu for the Virginia Council of Higher Education's Outstanding Faculty Award for the 1995-96 academic year; Mbagwu was selected as the recipient of this award as well.

The two other professors in the VSU Chemistry Department, Drs. Beck and Foster, both were born in the United States.[3] In October 1995, Epps evaluated Mbagwu for the period beginning January 1, 1995 and ending August 30, 1995. Epps gave Mbagwu a "noteworthy" in teaching, an "outstanding" in research, and a "noteworthy" in service, resulting in an overall rating of "noteworthy," and a recommended raise of two and one-half percent, which was approved by Lyons. Professor Foster also received an overall rating of "noteworthy" and a raise of two and one-half percent. Professor Beck, however, received an overall rating of "outstanding" and a three and eight-tenths percent raise. Epps commented on Mbagwu's evaluation form that Mbagwu did not receive an overall rating of "outstanding" because he "is often away from campus [and] often attends class late."

In November 1996, Epps rated Mbagwu for the 1995-96 academic year, awarding him a "satisfactory" in teaching, a "noteworthy" in research, and an "outstanding" in service. Epps gave Mbagwu an overall rating of "noteworthy" and recommended a four percent raise, which was approved by Lyons. For the same evaluation period, Foster received an overall rating of "noteworthy," with a five and one-half percent raise, and Beck received an overall rating of "outstanding," with a six percent raise. Again, Epps complained that Mbagwu failed to start his classes on time. When Mbagwu confronted Epps about his evaluation and raise, however, Epps asked Mbagwu, "why should [you] expect to receive outstanding in teaching when [you] have poor oral communication skills . . . students and colleagues in the chemistry department [have] difficulty understanding [your] English." Mbagwu immediately accused Epps of discrimination and demanded an apology. Epps responded that he was sorry if Mbagwu took offense at his comment.

In November 1997, Epps evaluated Mbagwu for the 1996-97 academic year. Epps gave Mbagwu a "noteworthy" in teaching, an "outstanding" in research, and a "noteworthy" in service. Epps awarded Mbagwu an overall rating of "noteworthy" and recommended a five

---

[3]In fact, there are three other professors in the VSU Chemistry Department, including Epps. Mbagwu compares himself to Foster and Beck because Epps evaluated them as well as Mbagwu. Epps, however, was evaluated by Lyons.

percent raise, which was approved by Lyons. For the same evaluation period, Foster received an overall rating of "noteworthy," with a four and nine-tenths percent raise, and Beck received an overall rating of "noteworthy," with a five and one-tenth percent raise. In 1998, Mbagwu received an overall rating of "noteworthy" and the fixed raise for that rating; Foster received the same rating; Beck's 1998 evaluation is not part of the record.

### III.

Appellants challenge the district court's denial of their Rule 50(b) motion for judgment as a matter of law and alternative motions for a new trial as to Saleh's retaliation claim and as to Mbagwu's national origin discrimination claim. We review a district court's denial of a Rule 50(b) motion for judgment as a matter of law de novo. *Konkel v. Bob Evans Farms, Inc.*, 165 F.3d 275, 279 (4th Cir. 1999). A Rule 50(b) motion should be granted if the district court determines that there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party. *Id.*; *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998). In making our own determination whether there was sufficient evidence for the jury verdict, we will not set aside the jury's credibility determinations in favor of our own. *Cline*, 144 F.3d at 301 (citing *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1419 (4th Cir. 1991)). We will assume that all testimony in favor of the non-movant is credible "unless totally incredible on its face." *Id*.

After a full trial on the merits, our "sole focus is 'discrimination vel non'—that is, whether in light of the applicable standard of review the jury's finding of unlawful retaliation [or discrimination] is supportable." *Id*. at 301 (citing *Jiminez v. Mary Washington College*, 57 F.3d 369, 376 (4th Cir. 1995)). "[O]ur review is circumscribed with respect to any facts the jury found, but plenary with respect to any legal conclusions underlying the verdict." *Price v. City of Charlotte*, 93 F.3d 1241, 1249 (4th Cir. 1996).

### A.

Saleh alleges that Moore, Dawson, and Lyons deprived him of his First Amendment rights by retaliating against him after he presented "Recent Acts" at the BOV meeting on July 6, 1995. To prevail on this

claim, Saleh "must first show that the expressions which are alleged to have provoked the retaliatory action relate to matters of public concern." *Huang v. Board of Governors*, 902 F. 2d 1134, 1140 (4th Cir. 1990) (citing *Connick v. Myers*, 461 U.S. 138, 146 (1983)). Second, Saleh must show that the alleged retaliatory action deprived him of some valuable benefit. *Id*. (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)). That is, Saleh must show that the employment actions directed toward him were sufficiently adverse to chill a reasonable person's willingness to exercise his First Amendment rights. *ACLU of Md. v. Wicomico County*, 999 F.2d 780 (4th Cir. 1993) (citing *Perry*, 408 U.S. at 597). Third, Saleh must demonstrate a causal connection between the presentation of "Recent Acts" and the alleged retaliatory acts. *Huang*, 902 F.2d at 1140.

In order to determine whether Saleh was speaking on a matter of public concern when he presented "Recent Acts" to the BOV, we inquire whether Saleh was speaking as a private citizen on a matter of public concern, or as an employee on a matter of personal concern. *Edwards v. City of Goldsboro*, 178 F.3d 231, 246 (4th Cir. 1999) (citing *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968)). We have explained that the answer to this inquiry "rests on 'whether the public or the community is likely to be concerned with or interested in the particular expression, or whether it is more properly viewed as a private matter between employer and employee.'" *Id*. at 247. Finally, "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147 (1983) (citations omitted). While it is clear that personal interest motivated Saleh in part to present "Recent Acts," we are convinced that a presentation to the Board of Visitors of a state university alleging a campus-wide campaign of racial discrimination in administrative and employment decisions qualifies as a matter of public concern. Appellants agree with this determination for the purposes of this appeal. They contend, however, that Saleh is unable to meet his burden as to the remaining two elements.

With regard to the second element of the *Huang* test, we have held that "a showing of adversity is essential to any retaliation claim." *ACLU of Md.*, 999 F.2d at 784. We have defined the requisite adversity as "some impairment of the plaintiff's rights," *id*., and have not

endeavored to provide an exhaustive list of sufficiently adverse actions in the context of retaliation for the exercise of First Amendment rights. Of course, "[n]ot every restriction is sufficient to chill the exercise of First Amendment rights[.]" *Dimeglio v. Haines*, 45 F.3d 790, 806 (4th Cir. 1995). We note, however, that something less onerous than an "adverse employment action" in the context of Title VII jurisprudence may so chill the exercise of constitutional rights as to constitute a showing of adversity in a First Amendment retaliation case under § 1983. *See, e.g., Power v. Summers*, 226 F.3d 815 (7th Cir. 2000). The dispositive inquiry is whether the adverse actions complained of, under the particular circumstances of the case, would deter the employee from again exercising his constitutional right to publicly comment on matters of public concern. *ACLU of Md.*, 999 F.2d at 784.

As to the third element of the *Huang* test, we noted then that "the causation requirement is rigorous; it is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that 'but for' the protected expression the employer would not have taken the alleged retaliatory action." *Huang*, 902 F.2d at 1140. We now address Saleh's specific allegations of retaliation.

## *TENURE*

In *Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999), we held that "a public employer is prohibited from threatening to discharge a public employee in an effort to chill that employee's rights under the First Amendment." *Id.* at 246 (citing *Rankin v. McPherson*, 483 U.S. 378, 384 (1987)). The question presented is whether this proscription extends to prevent a public employer from threatening to remove a public employee's tenure in an effort to chill the employee's First Amendment rights. We hold that it does.

*Edwards* and *Rankin* are rooted in the premise that "the threat of dismissal from public employment is a potent means of inhibiting speech." *Pickering v. Board of Educ.*, 391 U.S. 563, 574 (1968). A threat to remove one's tenure, however, is tantamount to a threat of dismissal. Since tenure prevents a professor from receiving a terminal employment contract, the revocation of tenure would be, in most con-

ceivable scenarios, the precursor to a terminal employment contract. Saleh became aware of this threat when Moore told him, "[y]ou make me work hard for you, I have to check your file. You don't have tenure. And I went to the board and the board wouldn't let me take your tenure." This statement, combined with the inquiry into Saleh's tenure conducted by Moore and Farley, amounted to an adverse action sufficient to chill the exercise of Saleh's First Amendment rights.

As to the element of causation, the temporal proximity between Saleh's presentation of "Recent Acts" and the inquiries into his tenure made by Moore and Farley supports the inference that Moore and Farley instigated a challenge to Saleh's tenure in response to protected activity. *See, e.g., Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989). Board member Garland Bigley testified that at a BOV meeting Moore reported that his review of the "minutes of the meetings of that time period" did not reveal a BOV vote approving tenure for Saleh. Bigley testified that it was "implicit" in Moore's comments "that the minutes had been reviewed to find that." Farley indicated in her comments to the Faculty Council that "we have yet to find [the record of Saleh's tenure approval by the BOV]." Most significantly, Farley stated in her pretrial deposition, which was taken before the tape of the Faculty Council Meeting was produced, she was aware that Stronach was involved with the presentation of "Recent Acts," but had never heard Saleh's name in connection with the document. When confronted at trial with her remarks to the Faculty Council, Farley admitted that she had testified incorrectly at her deposition, blaming the discrepancy on a lapse or memory. Apparently, the jury, which asked to hear the tape again during its deliberations, discredited this explanation. It is the function of the jury to assess the credibility of witnesses at trial. Based on our review of the record, we cannot say that no reasonable jury could have concluded that Farley and Moore threatened to revoke Saleh's tenure in retaliation for his exercising his First Amendment rights.

### *EVALUATIONS*

As discussed previously, Saleh received the lowest raises in his department for the years 1996, 1997, and 1998. In *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75-76 (1990), the Supreme Court recognized that a failure to rehire, a denial of a promotion, or a denial

of a transfer may constitute a deprivation of a valuable benefit. In so holding, the Court noted that public employees who are denied a promotion "stand to lose the considerable increases in pay and job satisfaction attendant to promotions[.]" *Id.* at 74. Similarly, in this case, Saleh allegedly lost considerable increases in pay because of Appellants' acts. Saleh's economic expert calculated Saleh's lost earnings as between $56,767.00 and $113,075.00. The reduction of Saleh's raises for three years in a row constitutes an adverse employment action that may be expected to chill an employee's First Amendment rights.

As to the issue of causation, there was ample evidence from which the jury could infer that Saleh's evaluations remained low at the direction of Lyons and with the implied consent of Dawson. As noted, in 1995, Demers commented to Saleh that he perceived an "aura" surrounding him. At trial Demers stated that the "aura" stemmed from the fact that Dawson and Lyons were unhappy with Saleh. The "aura," Demers testified, was still there in 1996. In 1997, Dr. Burbank allegedly told Dr. Saleh more bluntly, "[t]hey hate you. You are a thorn in Dr. Lyon's side." A reasonable jury could find that Lyons and Dawson ensured lower annual raises for Saleh in retaliation for Saleh's personally accusing them of racial discrimination with the presentation of "Recent Acts."

*SUMMER PAY*

After an investigation ordered by Moore revealed that at least six faculty members, including Saleh, had been overpaid, Moore asked only Saleh to repay $5,794.00 to VSU, and reported only Saleh to law enforcement authorities as a fraud suspect. Moore presented no evidence to justify the decision to single out Saleh for this treatment. Nor did Moore present any evidence that the auditor's interpretation of the relevant laws was the authoritative, or even correct, interpretation. To the contrary, BOV member Bigley testified that Moore had "skillfully avoided" answering her questions to this effect for "nearly two years." Under these circumstances, Moore's actions constitute an adverse action such as may be expected to chill the First Amendment rights of a public employee. *See also Hetzel v. County of Prince William*, 89 F.3d 169, 171 (4th Cir. 1996) (Internal Affairs investigation of plaintiff police officer was sufficiently adverse action to constitute

deprivation of a valuable benefit in First Amendment retaliation context).

Further, we find that there was sufficient evidence presented to the jury on the issue of causation from which to infer that Saleh was singled out in retaliation for his presentation of "Recent Acts." While almost a year elapsed between the presentation of "Recent Acts" and the summer pay incident, this fact alone is not fatal to Saleh's claim. *But see Dowe v. Total Action Against Poverty in Roanoke*, 145 F.3d 653, 656 (4th Cir. 1998) (finding three year time lapse between protected activity and alleged retaliation negates inference of causation). The inference of causation is not negated where, as here, the alleged retaliatory act was one of a set of similar acts occurring simultaneously or consecutively over the course of several years. In this case, evidence was presented that Moore and Farley attempted to remove Saleh's tenure in 1995; that Lyons and Dawson ensured that Saleh received lower raises in 1995, 1996, and 1997; that Saleh was singled out for repayment of an alleged overpayment in summer 1996; and that Saleh was reported to state police as a fraud suspect in summer 1996. We find that a reasonable jury could find that this conduct was undertaken in retaliation for Saleh's protected activity a year earlier.

For the foregoing reasons, we find that Saleh presented sufficient evidence from which a jury reasonably could infer that Moore, Dawson, Lyons and Farley retaliated against him for the presentation of "Recent Acts." Accordingly, we affirm the district court's denial of Appellants' motion for judgment as a matter of law as to this issue.[4]

---

[4]We note that Lyons' rejection of Saleh's research proposals does not constitute the kind of adverse action that would chill the reasonable person's exercise of his First Amendment rights. These were simply administrative decisions, best made by Lyons, and not a federal court. *See Dorsett v. Board of Tr. for State Coll. & Un.*, 940 F.2d 121, 124 (5th Cir. 1991) (noting that federal courts "have neither the competency nor the resources to undertake to micromanage the administration of thousands of state educational institutions") (citing *Clark v. Whiting*, 607 F.2d 634, 640 (4th Cir. 1979)). Moreover, as to the NRRI project, Lyons had informed Saleh in April 1994 that he was "recommending that all of your new initiatives relate to your area of expertise and be consistent with the goals and objectives of the Department of Engineering Technology."

## B.

To establish a prima facie case of discriminatory compensation on the basis of his national origin, Mbagwu was required to demonstrate that, as a member of a protected class, he was paid less than a similarly-situated employee who is not a member of a protected class. *See, e.g. Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir. 1994). As discussed, Mbagwu demonstrated that he received lower raises in 1995, 1996, and 1997 than Professor Beck, who was born in the United States, and a lower raise in 1996 than Dr. Foster, who also was born in the United States. Therefore, under the burden-shifting framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973), Appellants were required to offer a legitimate, non-discriminatory justification for Mbagwu's lower annual raises. Appellants met this burden of production by stating that Mbagwu received lower raises because he was late to class, and because students allegedly had difficulty understanding his accent. At that point, "the McDonnell Douglas framework . . . disappeared . . . and the sole remaining issue was discrimination vel non." *Reeves v. Sanderson Plumbing Prod., Inc.*, 120 S. Ct. 2097, 2106 (2000) (internal citations omitted).

---

Therefore, Lyons made the decision that agricultural grants could not be operated out of the Engineering Department over a year before the presentation of "Recent Acts." Therefore, Saleh failed to demonstrate the requisite causal connection between Lyon's decision and Saleh's exercise of his First Amendment rights.

Nor has Saleh presented sufficient evidence from which a jury reasonably could find that Appellants retaliated against him by interfering with his alleged consulting contract with RGV. Even assuming such a contract existed, and assuming that interference with this contract could constitute an adverse employment action, there is insufficient evidence in the record to establish that any defendant caused the RGV project to fail. The only testimony on this issue was that Richard Booker told Raymond Golden on two instances that Moore had a problem with Saleh, and told another witness that he would find himself in trouble hanging around Saleh. There was no evidence, however, that Moore told Booker that the project would not be allowed because Saleh was involved with the project as a consultant. Therefore, the jury could have reached this conclusion only by conjecture and speculation.

Mbagwu introduced Ron Mollick (Mollick) as an expert on faculty evaluation systems. Mollick testified that the VSU pay for performance system lacked necessary features, such as in-class observation of teaching and student evaluations of teaching, that would make the system more objective. Mollick explained to the jury that, for the years 1995, 1996 and 1997, there was a range within which all faculty members receiving the same overall rating could fall in terms of their annual raise; yet there were no criteria to establish why one professor received an overall rating of satisfactory and a given raise, while another professor received an overall rating of satisfactory and a lower or higher raise.[5] The combination of these features, Mollick opined, created a system left "wide open to subjective determinations, wide open to the possibility of abuse." Mollick's testimony went unrebutted. Indeed, Appellants concede in their brief that the pay for performance system "began as a subjective system open to the possibility of abuse." App. Br. at p. 18.

We cannot say that the evidence would not allow a reasonable jury to conclude that Appellants' proffered reasons for Mbagwu's low evaluations and annual raises were pretextual. Under *Reeves*, Mbagwu was not required to present affirmative evidence of Appellants' discriminatory intent. *Reeves*, 120 S. Ct. at 2108. Rather, "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.*

At trial, Appellants' proffered legitimate, non-discriminatory reasons for Mbagwu's lower evaluations and raises were inconsistent with their assessment of Mbagwu's performance in light of the fact that they nominated him for the "Giants in Science" and SCHEV awards. For example, in October 1995, Epps gave Mbagwu an overall rating of "noteworthy," and recommended a two and one-half percent raise, commenting on Mbagwu's evaluation form that he "is often away from campus, often attends class late, and does not appear to use time wisely." Just a few days later, Dawson commended Mbagwu in the Outstanding Faculty Award nomination materials for his "con-

---

[5]In 1996, both Mbagwu and Dr. Foster received an overall rating of noteworthy. Yet, Dr. Foster received a five and one-half percent raise, while Mbagwu received only a four percent raise.

sistent excellence in teaching, scholarship and service." In the same materials, Lyons wrote, "Dr. Mbagwu is an outstanding teacher and researcher at Virginia State University. He is highly respected by his peers and viewed as a positive role model by his students."

Later in 1996, after Mbagwu received the Outstanding Faculty Award, the BOV presented Mbagwu with a resolution commending him for his "excellence in teaching, research, and public service," and recognizing Mbagwu as an "outstanding teacher and researcher among his peers . . . ." However, in his evaluation of Mbagwu in November 1996, Epps gave Mbagwu an overall rating of "noteworthy," and the lowest raise in the department.

In addition, when Mbagwu complained to Epps about his 1996 evaluation and raise, Epps did not reiterate his written comments about lateness, but responded, "Why should [you] expect to receive outstanding in teaching when [you] have poor oral communication skills . . . students and colleagues in the chemistry department [have] difficulty understanding [your] English." We have held that "requiring a professor to speak the native tongue in order to convey his ideas is not any form of discrimination, invidious or otherwise." *Jiminez v. Mary Washington College*, 57 F.3d 369, 380 (4th Cir. 1995), and we affirm this proposition. However, the jury was not prohibited from considering Epps' comment in addition to other evidence of discriminatory animus. Epps had not discussed Mbagwu's accent with him in fifteen years as his supervisor. We cannot say that a jury could not reasonably have viewed this comment as a manifestation of a discriminatory animus toward foreign faculty.

Where, as in Mbagwu's case, the ultimate issue of discrimination vel non is "a close one, involving the sufficiency of circumstantial evidence and rational inferences to be drawn therefrom," we are "mindful of the Seventh Amendment's commission of factual questions to the jury and of our limited role of review." *Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1420 (4th Cir. 1992). In light of (1) the evidence tending to demonstrate that Moore "had a problem" with foreign faculty; (2) the subjective system for faculty evaluations; (3) the apparent inconsistency between Mbagwu's low evaluations and the praise he received from the administration; and (4) Epps' comment concerning Mbagwu's accent, we conclude that there was sufficient

evidence to support the jury's verdict as to Moore, Dawson, Lyons, and Epps.

We continue to "review professorial employment decisions with great trepidation." *Jiminez*, 57 F.3d at 376. We will not "substitute [our] judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure." *Id*. (quoting *Kunda v. Muhlenberg College*, 621 F.2d 532, 548 (3d Cir. 1980)). However, in *Jiminez* we held that "[d]eterminations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professional." *Id*. at 377. In this case, Mbagwu presented sufficient evidence from which the jury could infer that the VSU pay for performance system was used by Epps, Lyons, Dawson, and Moore as a "mechanism to obscure discrimination."

IV.

Appellants also challenge the district court's denial of their alternative motions for a new trial pursuant to Fed. R. Civ. P. 59(a). A new trial should be granted if "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996). The decision to grant or deny a new trial is in the sound discretion of the trial court, and is reviewed only for an abuse of that discretion. *Id*.

For the reasons previously discussed, we find that the verdict was not against the clear weight of the evidence. Nor is any demonstrably false evidence called to our attention. We cannot say that a miscarriage of justice occurred in this case. We agree with the district court that Appellees presented enough evidence to submit their retaliation and discrimination claims to a jury. Although on review of the denial of a new trial motion we are permitted to weigh the evidence and assess the credibility of witnesses, we are persuaded that the jury's credibility determinations should be left undisturbed. Accordingly, we

affirm the district court's refusal to grant a new trial in either Saleh's or Mbagwu's case.

## V.

Appellants also challenge the trial court's denial of their motions for a new trial and for a new trial nisi remittitur in both cases on the grounds that the damages awards are excessive. Whether a jury award is excessive is a question of law. *Konkel v. Bob Evans Farms, Inc.*, 165 F.3d 275, 280 (4th Cir. 1999) (citing *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 438-39 (1996)). The district court's decision whether or not to grant a new trial based upon an allegedly excessive verdict will not be disturbed on appeal absent an abuse of discretion. A damages award will be set aside only if it is "'against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice.'" *Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1414 (4th Cir. 1992) (quoting *Johnson v. Parrish*, 827 F.2d 988, 991 (4th Cir. 1987)). If we find that the jury's award of compensatory damages was excessive, we have the option of ordering a new trial, or granting the plaintiff a new trial nisi remittitur. *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir. 1998).

An award of compensatory damages under § 1983 "must be proportional to the actual injury incurred . . . ." *Price v. City of Charlotte*, 89 F.3d 169, 172 (4th Cir. 1996) (quoting *Piver v. Pender County Bd. of Educ.*, 835 F.2d 1076, 1082 (4th Cir. 1987), *cert. denied*, 487 U.S. 1206 (1988)). Compensatory damages for emotional distress must be proven by competent, sufficient evidence. *Id.* (citing *Carey v. Piphus*, 435 U.S. 247, 263 (1978)). Further, an award of compensatory damages for emotional distress "must be attributed to the invidious discrimination, not to the deprivation of an ultimate benefit." *Id.*

## A.

The jury awarded Saleh $97,769.00 in compensatory damages. Appellants argue that, in the event that we affirm the district court's denial of their motion for a directed verdict, Saleh is entitled to nominal damages of one dollar. We disagree.

There was ample evidence from which the jury could find that Saleh suffered both economic injury and emotional distress as a result of the Appellants' retaliatory actions. Saleh's economic expert, David Parcell, opined that Saleh's lower evaluations deprived him of between $56,767.00 and $113,075.00. Parcell's testimony on this point went unrebutted, and it was for the jury to assess his credibility. Even if Saleh suffered economic injury at the lowest end of the range posited by Parcell, we conclude that there was sufficient evidence that Appellants caused Saleh emotional distress and related health problems to support the remainder of the award.

Saleh testified as to the effects that Appellants' retaliatory acts had on him:

> I was very stressed. I was emotionally and mentally drained. I have problems sleeping. I was sweating and waking up every night so many times, I get up in the morning, I can't move. I have no energy, continuous fatigue . . . I was extremely down, discouraged. I feel like I have no hope, no place. I have been through this so many times, I can't do anything to grow in my field. I can't work in this place. I don't know what to do. I was demoralized and my health was going down.

In *Hetzel v. County of Prince William*, 89 F.3d 169 (4th Cir. 1996), we vacated an award of $500,000.00 for emotional distress allegedly caused by the defendant's retaliatory acts where the award was "based almost entirely on Hetzel's own self-serving testimony concerning stress and headaches." *Id*. at 172. We also noted that Hetzel's discrimination claims were rejected by the jury, that she was not physically injured, that she remained an officer in good standing with the defendant, and that she had not sought care from a physician. Saleh's discrimination claim likewise was rejected by the jury, and he also remains employed. However, unlike Hetzel, Saleh introduced independent evidence of his emotional distress and related health problems. Dr. Saleh took eight weeks of medical leave in early 1997. During that leave, Saleh was admitted to a hospital on two occasions, and treated for hypertension, atrial fibrillation, and diabetes. Saleh's treating physician, Dr. Ellenbogen, opined that each of these conditions was exacerbated by Saleh's stress at work. Dr. Ellenbogen also

attributed Saleh's sleeping problems to stress at work. Finally, *Hetzel* is distinguishable because as much as half of the $97,769.00 awarded can be attributed to the economic injuries Saleh suffered because of his alleged retaliatory low raises.

In *Johnson v. Hugo's Skateway*, we recognized "the difficulty in measuring the amount appropriate to compensate for the emotional injuries resulting from [racial discrimination]." 974 F.2d 1408, 1414 (4th Cir. 1992). In *Johnson*, we upheld a jury award of $25,000.00 to a victim of racial discrimination where the alleged acts transpired in one night. As discussed above, in this case, the jury could have found that Appellants retaliated against Saleh by giving him low annual raises from 1995 to 1998, by reporting him to state police for suspected fraud in 1996, and by challenging his tenure in 1995. Since the jury was entitled to find that each of these events caused Saleh emotional distress, we cannot say that the jury award is excessive.

## B.

The jury awarded Mbagwu $194,829.00 in compensatory damages. Mbagwu's economic expert, David Parcell, opined that Mbagwu's lower evaluations deprived him of $47,667.00. As in Saleh's case, this testimony went unrebutted, and Appellants have stated in their briefs that they do not dispute this figure. App. Reply Brief at 14. Assuming the jury found this testimony credible, Mbagwu was awarded approximately $150,000.00 to compensate for emotional distress. We find that this award was against the weight of the evidence.

Mbagwu testified that the discrimination he experienced severely affected him:

> To say the least, it has been a very devastating experience, and it has affected my life, my family life, my relationship with my wife, my children. I feel very sad, very betrayed very isolated . . . . I feel betrayed because I spent most of my career and efforts at Virginia State University trying to help my students. I have worked very hard to help my students. That's perhaps one of the primary reasons why I came to Virginia State University. But my effort is not being appreciated, and I feel betrayed because Dr. Epps and the

administration . . . had supported me up to 1993. . . . The stress has led to sleeplessness, insomnia. In the morning I get up, I feel exhausted and tired. I feel stressed out, but I still got to go to school because of my students. . . . When I get to school, I feel ostracized, a sense that I do not belong to the environment where I have made major contributions . . . . So I feel betrayed, and sleeplessness, insomnia, you can't imagine what insomnia can do to you. It s 24-hour problem, a 24-hour problem.

As in Saleh's case, the jury was entitled to find that Mbagwu was subjected to emotional distress throughout a period of approximately four years. Unlike Saleh, however, Mbagwu presented no medical evidence to corroborate his testimony about the emotional distress he endured. Moreover, as was true of the plaintiff in *Hetzel*, Mbagwu never sought medical or psychological care for his stress and insomnia. A plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress based on a constitutional violation. *See Price v. City of Charlotte*, 93 F.3d 1241, 1254 (4th Cir. 1996). However, that testimony must competently demonstrate a "genuine injury." *Id.* (quoting *Carey*, 435 U.S. at 264). Mbagwu's testimony, standing alone, simply does not support an award of $150,000.00 for emotional distress. On the evidence presented, we find that $75,000.00 in compensatory damages is the largest award that could be sustained. We add to this the $47,667.00 in compensatory damages for economic injury, for a total figure of $122,667.00. Accordingly, we reduce Mbagwu's compensatory damages award to $122,667.00 and grant a new trial nisi remittitur at Mbagwu's option.

VI.

Appellants argue that the district court committed reversible error by admitting Plaintiff's Exhibit No. 395. That document is a chart that was composed by Appellants and produced by them in connection with a Rule 30(b)(6) deposition of VSU's Director of Human Resources. The chart lists several faculty members in VSU's AST School, and tells the race, birthplace, time of hiring, reason for selection, and current position of each. Appellants objected to the chart's admission on the grounds that its probative value was substantially outweighed by its potentially prejudicial effect. Fed. R. Evid. 403.

Decisions regarding the admissibility of evidence are peculiarly within the province of the district court, and will not be reversed on appeal absent an abuse of discretion. *Martin v. Deiriggi*, 985 F.2d 129, 137 (4th Cir. 1992). We agree with the district court that the chart's prejudicial effect did not substantially outweigh its probative value. The chart's probative value lay in its tendency to demonstrate that it was easier for an African-American to find employment at the AST School than it was for a white American or foreign-born individual. Appellants argue the chart's potential to confuse the jury was "manifest" because the jury "did not know the qualifications of the persons who applied for these positions, did not know whether any of the applicants withdrew their names from consideration, and did not know all the factors that went into each hiring decision." App. Br. at 48. However, Appellants were not prohibited from offering this information into evidence in order to negate any inference of discrimination that the chart created. We cannot say that admitting the chart amounted to an abuse of discretion.

## VII.

On cross-appeal, Saleh argues that the district court erred in granting summary judgment as to his state law claims for conspiracy to injure another in his business or profession, and for tortious interference with alleged contracts. We have reviewed the record and the district court's opinion and find no reversible error. Accordingly, we affirm on the reasoning of the district court. *See Saleh v. Moore*, No. CA-97-460 (E.D. Va., Feb. 25, 1999).

## VIII.

Appellants argue that the district court's award of attorneys' fees to Saleh and Mbagwu is excessive. We disagree. We review the amount of an award of attorney's fees only for an abuse of discretion. *Brodziak v. Runyon*, 145 F.3d 194, 195 (4th Cir. 1998). The district court abuses its discretion when the fee award is "clearly wrong." *Id*.

We have reviewed the record and the district court's opinion, and find no abuse of discretion. In a thorough and well-reasoned opinion, the district court arrived at an appropriate award of attorneys' fees.

*See Saleh v. Moore*, 95 F. Supp. 2d 555 (E.D. Va. 2000). The decision of the district court is affirmed as to this issue.

*AFFIRMED*