**Linda K. LOVELL, Plaintiff,**

v.

**BBNT SOLUTIONS, LLC, et al., Defendants.**

**No. CIV.A.03–271–A.**

United States District Court, E.D. Virginia, Alexandria Division.

Dec. 11, 2003.

Ellen Kyriacou Renaud, Swick & Shapiro, P.C., Washington, DC, for Plaintiffs/Movants.

Tara Nicole Mora, McGuireWoods LLP, Washington, DC, for Defendants/Respondents.

### *MEMORANDUM OPINION*

ELLIS, District Judge.

In this Title VII [1] and Equal Pay Act [2] ("EPA") sex discrimination action based on salary and raise disparities, defendant-employers BBNT Solutions, LLC and Verizon Communications, Inc. seek to set aside the jury's verdict in favor of plaintiff-employee, Linda Lovell, through their Renewed Motion for Judgment as a Matter of Law pursuant to Rule 50(b), Fed.R.Civ.P., or, in the alternative, Motion for a New Trial pursuant to Rule 59(a), Fed.R.Civ.P. As a result, at issue are the following questions:

(i) whether plaintiff presented a *prima facie* case under both Title VII and the EPA regarding her disparate pay claim;

(ii) whether plaintiff presented a *prima facie* case under Title VII with respect to her raise claim;

(iii) whether there is sufficient evidence in the record to support the award of compensatory damages; and

(iv) whether the jury's award of economic damages under Title VII and the EPA was excessive.

### I.[3]

Plaintiff, Linda Lovell, began working at

---

**1.** Title VII of the Civil Rights Act of 1964 is codified, as amended, at 42 U.S.C. § 2000e *et seq.*

**2.** The Equal Pay Act of 1963 is codified at 29 U.S.C. § 206(d).

**3.** As required by settled authority, the facts recited here are derived from the record and are taken in the light most favorable to the non-movant, plaintiff in this case. *See Lack v.*

BBN [4] as a materials engineer in the Marine Engineering Group in January 1994. BBN, a subsidiary of Verizon Communication, Inc., provides contract research and development services across a broad spectrum of physical and information sciences, predominantly to Department of Defense research organizations. Currently, BBN is divided into nine departments, including the Sensor Systems and Technology Department, which is headed by Jude Nitsche. The Marine Engineering Group, headed by Jay Miner, is a component of the Sensor Systems and Technology Department; its focus is on mature technology, primarily in support of ship design improvement. The Marine Engineering Group, in turn, is comprised of two subgroups: Materials and Acoustics. The Materials subgroup supports the United States Navy and performs tests, evaluations, and drafts specifications for non-metallic materials for use on Navy ships. The Acoustics subgroup supports both government and private contractors in the prediction, measurement, and design of acoustic instruments to reduce excessive noise and vibration on Navy ships and civilian ships.

Plaintiff holds an undergraduate degree in textile chemistry from the University of Delaware and a master's degree in business administration from Southern Illinois University. In her graduate training, she specialized in program management. Prior to her employment at BBN, plaintiff worked as a junior chemist at American Cyanamid in New Jersey for two years, a materials engineer at ILC Dover, and then as a physical scientist in the Non–Metallic Materials Office of the Naval Sea Systems Command ("NAVSEA") for six years, and finally in 1992, plaintiff transferred to the Department of Transportation ("DOT") and worked in the Radioactive Materials Group of DOT's Research and Special Projects Administration. Her current title at BBN is Senior Staff Consultant—Technology.

Plaintiff, at her request, works a reduced-hour schedule of thirty (30) hours per week at BBN. Despite her reduced-hour schedule, plaintiff testified that she made herself available on her day off to attend meetings with clients and perform other BBN work. Based on a thirty-hour work week, plaintiff's current salary is $77,500. Testimony at trial revealed that plaintiff's primary job duties were (i) to write proposals, (ii) to market her services and bring in new business to BBN, and (iii) to perform technical work on projects.

Important to the rating and advancement of employees at BBN is their "billability," by which is meant how much of their time is spent on work that can be billed to a contract. In general, hours spent writing proposals and marketing or bringing in business to BBN are not billable to a contract; whereas technical work performed on a project is billed to the appropriate contract. Billable hour goals were set for BBN employees, including plaintiff.

At trial, plaintiff testified that her male coworkers did not provide her with the opportunity to work and charge billable hours on their projects, although she provided them with that opportunity on her projects. Plaintiff further testified that her male co-workers sometimes charged hours to projects she was managing without her knowledge, resulting in budget overruns on some of these projects. She also testified that, in addition to meeting her billable hour goals, she was also required to market and bring in new business to BBN in order to enable her to

---

*Wal–Mart Stores, Inc.,* 240 F.3d 255, 259 (4th Cir.2001).

4. BBNT Solutions, LLC is a legal entity that does business as BBN Technologies ("BBN").

maintain and meet her billable hour goals. There was also evidence that plaintiff, as the only female in her group, was the only employee in her group who did not receive a laptop computer and that, on one occasion, she was not invited to a training session.

In connection with her EPA and Title VII disparate pay claims, plaintiff sought to compare herself to two male employees at BBN who received higher salaries: Pete Gauthier and Charles McNamara. It became evident at trial, however, that Gauthier, the Technical Lead of the Materials group, was not a suitable comparator, as his position entailed significant supervisory and other duties that were not part of plaintiff's position. Therefore, at the close of all the evidence, defendants' renewed motion for judgment as a matter of law pursuant to Rule 50, Fed.R.Civ.P., was granted on this issue and plaintiff was thereafter limited to McNamara as the sole appropriate comparator.[5]

According to the record, McNamara holds an undergraduate degree in mechanical engineering from Marquette University and a master's degree in structural engineering from George Washington University. Before joining BBN in June 2002, McNamara worked first as a structural engineer at the Naval Surface Warfare Center. He then joined Anteon, a competitor of BBN, first as a senior engineer, next as manager, thereafter as corporate program manager, and finally as marketing director. At the time McNamara applied for a position at BBN, he was earning $104,000 at Anteon. In the salary bargaining process, he asked for a starting salary of $110,000 at BBN. BBN countered

with $105,000, which McNamara accepted. In April 2003, McNamara received a 2.38% raise that increased his salary to $107,500. McNamara works a forty (40) hour per week schedule at BBN. His current title is Senior Staff Consultant—Program Management.

Defendants elicited testimony from Miner that, while at Anteon, McNamara worked on two multimillion dollar contracts for which BBN was also competing. BBN ultimately lost these contracts to Anteon. Miner testified that he decided to hire McNamara because it was an excellent opportunity to take a strong marketing person from a competitor. The evidence at trial also suggested, however, that after he was hired, McNamara did not, on his own, bring any new business into BBN. Defendants offered McNamara's prior salary and experience as their legitimate, nondiscriminatory reason for paying him more than they paid plaintiff. At trial, however, plaintiff confronted Nitsche with his deposition testimony in which he had stated that if market conditions required paying an outsider a higher salary to join BBN, salaries within the company would rise. But Nitsche had also testified that marine engineering was not a "hot area" that required such salary increases.

Plaintiff's Title VII raise claim is based on the 1.36% pay raise she received in 2002, a raise she claims was less than the average percentage raise given to others in her group with similar performance ratings. Pay raises at BBN are based on a number of factors, including performance reviews. In her 2001 performance evalua-

---

5. *See Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 613 (4th Cir.1999) (noting that to establish *prima facie* case under EPA, plaintiff must show that her comparator holds a job that requires equal skill, effort and responsibility, and is performed under similar working conditions); *Brinkley–Obu v. Hughes*

*Training, Inc.,* 36 F.3d 336, 343 (4th Cir.1994) (plaintiff must show "that the job she occupied was similar to higher paying jobs occupied by males" in order to establish *prima facie* case of pay discrimination under Title VII).

tion, plaintiff initially received an overall performance rating of "Room for Improvement," which, at Miner's insistence, was later altered to a rating of "High Standard." Also noted on plaintiff's evaluation was an instance where plaintiff "mistakenly obligated a large sum of funding without preparing the necessary requisitions for senior management/finance approval." At his deposition, Nitsche testified that plaintiff's raise was not increased after the change to "High Standard" was made because the compensation system was closed. At trial, however, he testified that he did not change plaintiff's raise to reflect the evaluation change because he wanted to convey to plaintiff that her improper purchase requisition was a serious performance issue. Nitsche also testified that "High Standard" is a term BBN coined to mean "average" and that it covers a broad spectrum of the BBN population—"[n]ot just the top of the bell curve, but most of the bell curve." For her part, plaintiff testified at trial that employees receiving a "High Standard" rating typically received a four to six percent raise. With respect to the purchase requisition issue, she testified that she had followed the same procedures in this instance as she always had and had never before been reprimanded; this was the first time, she testified, that she had been told she needed to follow a different procedure.

The year that plaintiff received the 1.36% raise (2002), she also received $8,967 in incentive pay. On cross-examination, plaintiff testified that prior to 2002, she had received satisfactory pay raises every year. In 2003, the year after she received the 1.36% raise, plaintiff received a 4% raise.

At the close of the trial, the jury returned a verdict in favor of the plaintiff on each of the three claims submitted to it— (i) the EPA claim, (ii) the Title VII pay claim, and (iii) the Title VII raise claim. For damages, the jury awarded plaintiff a total of $400,000 for her two Title VII claims: $325,000 in compensatory damages and $75,000 in back pay.[6] The jury also awarded plaintiff $100,000 on her EPA claim. Defendants now seek to set aside the jury's verdict in favor of plaintiff pursuant to Rule 50(b), Fed.R.Civ.P., or, alternatively move for a new trial pursuant to Rule 59(a), Fed.R.Civ.P.

## II.

Jury verdicts are entitled to the "utmost respect." *Szedlock v. Tenet,* 139 F.Supp.2d 725, 729 (E.D.Va.2001), *aff'd,* 61 Fed. Appx. 88 (4th Cir.2003). Nevertheless, under Rule 50, Fed.R.Civ.P., if "there is no legally sufficient evidentiary basis" for a jury's verdict, a motion for judgment as a matter of law must be granted. *Price v. City of Charlotte,* 93 F.3d 1241, 1250 (4th Cir.1996). In assessing whether this standard has been met, courts must view the evidence, and all reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party. *Lack v. Wal–Mart Stores, Inc.,* 240 F.3d 255, 259 (4th Cir.2001). Courts may not substitute their judgment for that of the jury or make credibility determinations. *Price,* 93 F.3d at 1249. If there is evidence on which a reasonable jury could return a verdict in favor of the nonmoving party,

---

**6.** Before submission of the case to the jury, defendants' motion for judgment as a matter of law pursuant to Rule 50(b), Fed.R.Civ.P., was granted with respect to punitive damages under Title VII because the record did not reflect that defendants "engaged in intentional discrimination 'with malice or with reckless indifference to [the plaintiff's] federally protected rights.'" *Ocheltree v. Scollon Prod., Inc.,* 335 F.3d 325, 335 (4th Cir.2003) (quoting 42 U.S.C. § 1981a(b)(1)); *see also Bryant v. Aiken Regional Medical Ctrs. Inc.,* 333 F.3d 536, 548–49 (4th Cir.2003).

that verdict must be upheld. *Id.* at 1249–50.

■ The standard governing motions for a new trial pursuant to Rule 59, Fed. R.Civ.P., is significantly different. On a Rule 59 motion, a district court may set aside the jury's verdict and grant a new trial only if "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.,* 99 F.3d 587, 594 (4th Cir.1996). And, on a Rule 59 motion, courts may make credibility judgments in determining the clear weight of the evidence. *Knussman v. Maryland,* 272 F.3d 625, 647 (4th Cir.2001).

Each of defendants' claims is separately addressed under these standards.

## A. The Equal Pay Act Claim

■ The EPA prohibits employers from paying an employee at a rate less than that paid to employees of the opposite sex for equal work. *See* 29 U.S.C. § 206(d)(1). Under the Act, a plaintiff must first establish a *prima facie* case of wage discrimination. *See Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 613 (4th Cir.1999). And, to establish a *prima facie* case, a plaintiff must prove: (1) that the defendant employer pays different wages to employees of opposite sexes; (2) that these employees hold jobs that require equal skill, effort, and responsibility; and (3) that such jobs are performed under

similar working conditions. *Id.* Once a plaintiff establishes a *prima facie* case, the burden of production and persuasion shifts to defendant employers to persuade the jury by a preponderance of the evidence that any existing wage differential resulted from one of four enumerated statutory defenses:

"(i) a seniority system;

(ii) a merit system;

(iii) a system which measures earnings by quantity or quality of production; or

(iv) a differential based on any other factor other than sex." [7] 29 U.S.C. § 206(d)(1); *see also Brinkley,* 180 F.3d at 613–14.

■■ Significantly, a plaintiff need not prove that her job is identical to a higher paid job; rather, the test is one of substantial equality. *See Burlington Indus. Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Brennan v. Prince William Hosp. Corp.,* 503 F.2d 282, 291 (4th Cir.1974). Thus, application of the EPA depends not simply on job titles, descriptions, or classifications, but rather on the actual requirements, performance, and content of the jobs being compared. *Brennan,* 503 F.2d at 288. Under the EPA, therefore, plaintiff was required to select a specific male comparator, *see Strag v. Bd. of Trustees,* 55 F.3d 943, 950 (4th Cir.1995), and show that she and her comparator shared a common core of tasks in their jobs. *Hassman v. Valley Motors, Inc.,* 790 F.Supp. 564, 567 (D.Md.1992) (cited for this proposition with approval in

---

**7.** This differs from the *McDonnell Douglas* Title VII framework. In a Title VII case, once the plaintiff has established her *prima facie* case, the employer need only articulate a legitimate, nondiscriminatory reason for the action. Once the defendant meets this burden of production, the plaintiff must present evidence sufficient to support an inference of

pretext in order to survive a defendant's motion for judgment as a matter of law. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

*Dibble v. Regents of Univ. of Maryland System*, 89 F.3d 828, 1996 WL 350019 (Table) (4th Cir.1996) (unpublished). In this respect, plaintiff's male comparator was Charles McNamara.[8]

Defendants argue that plaintiff failed to establish her *prima facie* case under the EPA. In this regard, they contend first that plaintiff and McNamara did not perform jobs requiring equal effort because McNamara is a salaried employee who works a forty-hour work week, while plaintiff, also a salaried employee, works a reduced-hour schedule of thirty hours per week. According to defendants, this difference in hours alone, under the EPA, precludes a valid comparison between plaintiff and McNamara. Plaintiff contends, however, that the words of the statute itself allow for such a comparison, as the EPA prohibits an employer from discriminating between employees on the basis of sex "by paying wages to employees ... *at a rate less than the rate* at which he pays wages to employees of the opposite sex ... for equal work ...." 29 U.S.C.A. § 206(d)(1) (emphasis added). Plaintiff does not contend that a comparison between employees who work a different number of hours should always be allowed, but rather that this determination should be made by focusing on "the 'actual duties' performed by each employee as part of the job," not hours alone. *Hassman v. Valley Motors, Inc.*, 790 F.Supp. 564, 568 (D.Md. 1992).

■ Neither the statute nor controlling circuit authority squarely addresses whether full-time employees are, on that basis alone, unsuitable comparators for part-time employee plaintiffs. Although the statutory language does not conclusively answer this question, Congress's use of the word "rate" points persuasively to the conclusion that a valid comparison is not necessarily foreclosed merely on the basis of a difference in the number of hours worked per week. To be sure, where the putative comparator works only a small fraction of the hours a claimant works, that person may, as a matter of law, be ineligible to serve as a comparator under the EPA. But where, as here, the plaintiff is required to work three quarters of the hours worked by the putative comparator and in fact on occasion works more, and where the plaintiff's actual tasks, duties, and responsibilities are essentially similar to those of the putative comparator, then the issue becomes one of fact for the jury to resolve.

This conclusion finds support in the pertinent regulations and in authority from other circuits. Thus, in the Department of Labor's regulations, it is stated that "[e]ffort is concerned with the measurement of the physical or mental exertion needed for the performance of a job." 29 C.F.R. § 1620.16(a). And, consistent with this is the test for determining equality of effort under the EPA set forth in the Fifth Circuit's oft-cited decision in *Hodgson v. Brookhaven General Hospital:*

> [J]obs do not entail equal effort, even though they entail most of the same routine duties, if the more highly paid job involves additional tasks which (1) require extra effort, (2) consume a significant amount of the time of all those whose pay differentials are to be justified in terms of them, and (3) are on an economic value commensurate with the pay differential.

436 F.2d 719, 725 (5th Cir.1970) (cited for this test in *Hodgson v. Fairmont Supply*

---

8. As noted earlier, plaintiff's initial attempt to compare herself to Pete Gauthier failed for, at the close of all the evidence, defendants' renewed motion for judgment as a matter of law was granted on this issue and plaintiff was limited to McNamara as an appropriate comparator. *See supra* note 5 and accompanying text.

*Co.,* 454 F.2d 490, 493 (4th Cir.1972)). Thus, the proper focus is whether there are any additional tasks or job duties. While it is undisputed that McNamara worked ten hours more per week than plaintiff, defendants do not argue, nor does the record reflect, that during his ten additional hours at work McNamara performed any additional tasks that plaintiff did not perform. Instead, the evidence at trial showed that both plaintiff and McNamara were "senior engineers." Tr. Vol. 2 at 256. The testimony of several witnesses confirmed that the primary duties of both plaintiff and McNamara were to develop new business, manage programs, and perform research and development. *See* Tr. Vol. 1 at 110–11 (Lovell's duties); Tr. Vol. 3 at 56 (McNamara's duties); Tr. Vol. 2 at 172–74 (Miner testifying about duties of senior engineers). Both plaintiff and McNamara report to and are reviewed by the same supervisor, Jay Miner. Neither employee had supervisory duties of their own. While more hours at work may sometimes be the consequence of additional duties and responsibilities, the evidence in this case does not suggest that this was the case here. Therefore, within the *Hodgson* framework, defendants' only argument appears to be that the requirement that McNamara be at work for an additional ten hours per week is an additional task or duty that plaintiff is not required to undertake because of her reduced-hour schedule. Assuming *arguendo* that additional hours at work can be considered an additional task or duty, this argument fails under the *Hodgson* test because these ten additional hours are not "on an economic value commensurate with the pay differential" between plaintiff and McNamara. *Hodgson,* 436 F.2d at 725. Simply put, it was open to the jury to find on the record in this case that plaintiff is paid at a lower rate than the rate for McNamara.

Defendants' reliance on *LaRocco v. Nalco Chemical Co.,* 1999 WL 199251 (N.D.Ill. 1999), and *Ilhardt v. Sara Lee Corp.,* 118 F.3d 1151 (7th Cir.1997), for the proposition that reduced-hour employees can never be compared to full-time employees is not convincing. This type of categorical rule is unwarranted under the EPA, where it is clear that the Act "must be applied on a case by case basis to factual situations that are, for practical purposes, unique." *Brennan v. Prince William Hosp. Corp.,* 503 F.2d 282, 286 (4th Cir.1974). *Ilhardt,* moreover, is distinguishable; it is a pregnancy discrimination case in which the plaintiff was a part-time employee working three days per week. 118 F.3d at 1152. She filed a disparate treatment claim under the Pregnancy Discrimination Act, arguing that she was discharged as part of a reduction in force because she was pregnant. Her employer argued that she was discharged because she was a part-time employee, not because she was pregnant. *Id.* at 1155. Because there were no other part-time employees, the court there concluded that Ilhardt could not show that others similarly situated were not discharged, reasoning that "full-time employees are simply not similarly situated to part-time employees." *Id.* In a context where part-time status itself is the employer's asserted reason for discharging an employee, one can understand a court's requirement that the plaintiff compare herself to other part-time employees who were not pregnant in order to warrant an inference of pregnancy discrimination. Thus, *Ilhardt* in no way supports a categorical rule that all "full-time employees are simply not similarly situated to part-time employees" in EPA cases. To the contrary, in EPA cases, the specific facts should be examined to determine whether a proposed comparator performs substantially equal work, and "whether the work of two employees is substantially equal

must be resolved by the overall comparison of work, not its individual segments." *Buntin v. Breathitt County Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir.1998).

The Fourth Circuit's decision in *Dibble v. Regents of the University of Maryland System,* is supportive of the principle that the specific facts of a case, not a categorical rule, should determine whether a part-time plaintiff can appropriately designate a full-time comparator. There, a part-time professor attempted to compare herself to full-time faculty members. On these facts, the panel noted that "[t]he *undisputed evidence in the record* reveals that the *duties* of a part-time professor are far less demanding than those of an assistant professor or another full-time faculty member." 89 F.3d 828 (Table), 1996 WL 350019, *3 (4th Cir.1996) (emphasis added). The panel went on to discuss in great detail the job duties of the plaintiff and her proposed male comparator.[9] Thus, *Dibble* did not apply a categorical part-time/full-time rule; the panel instead examined the evidence in the record to determine that on the record in that case, the part-time plaintiff could not designate a full-time professor comparator because their duties were different. The key is therefore a difference in duties, not a difference in hours.

▇▇▇▇▇ Under defendants' theory, a female employee who works thirty-eight hours per week cannot compare herself to a male employee who works forty hours per week, even if their jobs are otherwise exactly the same and the pay differential cannot be explained by the extra hours. Indeed, such a rule would allow an employer to avoid the EPA's strictures by simply employing women in jobs with slightly reduced-hour schedules and paying them at a lower rate than their male counterparts. Such a loophole would completely subvert the EPA's purpose. It follows, therefore, that the EPA, properly construed, does not categorically preclude a part-time plaintiff from establishing a *prima facie* pay discrimination claim by designating a full-time comparator. The Act's legislative history supports this conclusion and makes clear that the difference in hours worked by a comparator should be considered after the plaintiff has made her *prima facie* case, as an affirmative defense to paying a male more based on a factor other than sex. Thus, this history reflects that

> It is the intent of this committee that any discrimination based upon any of these exceptions shall be exempted from the operation of this statute. As it is impossible to list each and every exception, the broad general exclusion has been also included. Thus, among other things, shift differentials, restrictions on or differences based on time of day worked, *hours of work,* lifting or moving heavy objects, differences based on experience, training, or ability would also be excluded.

H.R.Rep. No. 309, 88th Cong., 1st Sess. 3, U.S.Code Cong. & Admin. News 1963, p. 687 (emphasis added). Because "hours of work" is listed as an example of an affirmative defense in the catchall "factor other than sex" exception under the Act, this implies that the number of hours worked is not determinative at the *prima facie* stage in all cases.[10] Thus, because there is no evidence in the record that McNamara

---

9. The panel noted that the proposed male comparator "was required to advise students in their major, participate in curriculum development, oversee the curriculum, participate in departmental, university, and community activities, and attend departmental meetings," while the plaintiff was not. *Dibble,* 1996 WL 350019 at *3.

10. It is also clear that "hours of work" does not refer to the time of day in which a job is performed, as another example listed is "differences based on time of day worked."

performed additional tasks or duties as part of his job on an economic value commensurate with the pay differential between plaintiff and McNamara, a reasonable jury could conclude that plaintiff and McNamara perform jobs requiring equal effort. Consequently, defendants are not entitled to judgment as a matter of law on this point.

This does not end the analysis of defendants' challenge to the jury's verdict under the EPA, for defendants also contend that McNamara is not a viable comparator under the Act because plaintiff and McNamara did not perform jobs requiring equal skill and responsibility. Yet, in this respect, defendants point to no record evidence showing that McNamara's job entailed greater responsibility than plaintiff's job. In making their "equal skill" argument, defendants note that McNamara has an undergraduate degree in mechanical engineering and a master's degree in structural engineering, as well as experience in structural acoustics, while plaintiff does not. The relevant comparison here, however, is a comparison of the skills *required by the job*, not a comparison of the skills *possessed* by individual employees. *See Goodrich v. IBEW*, 815 F.2d 1519 (D.C.Cir.1987); *Glenn v. General Motors Corp.*, 841 F.2d 1567 (11th Cir.1988). Possession of a skill not needed to perform a job "cannot be considered in making a determination regarding equality of skill." [11] 29 C.F.R. § 1620.15(a). The record evidence does not support the argument that McNamara's position, "Senior Staff Consultant—Program Management," requires a master's degree in structural engineering or experience in acoustics.

In sum, viewing the evidence in the light most favorable to plaintiff, a reasonable jury could conclude from the trial evidence that McNamara and Lovell performed substantially equal work. Given this, judgment as a matter of law for defendants on this issue is unwarranted. Similarly, the jury's conclusion is not clearly against the weight of the evidence so as to warrant the grant of a new trial on this issue.

Defendants' final attack on the jury's EPA verdict is that even if plaintiff established a *prima facie* case under the EPA, defendants nonetheless presented unrebutted evidence of factors other than sex for paying McNamara more. Specifically, defendants correctly argue that "[o]ffering a higher starting salary in order to induce a candidate to accept the employer's offer ... has been recognized as a valid factor other than sex justifying a wage disparity." *Glunt v. GES Exposition Services, Inc.*, 123 F.Supp.2d 847, 859 (D.Md.2000) (citations omitted). It is also true that differing experience and education can also constitute a valid "factor other than sex." *See Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 614 (4th Cir.1999). At trial, defendants presented evidence that McNamara had an undergraduate degree in mechanical engineering and a master's degree in structural engineering. Defendants also showed that McNamara, while employed at defendants' competitor, Anteon, participated in preparing two proposals for multi-million dollar contracts that defendants were also attempting to win. Also, it is undisputed that at the time defendants began discussing the possibility of entering into an employment relationship with McNamara, he was making $104,000 at Anteon and was asking defendants for a

---

**11.** A difference in the skills of individual employees can, however, justify unequal wages under the catchall statutory exception for wage differentials based on "any factor other than sex." *See, e.g., Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 n. 18 (11th Cir.1992) (noting that a wage differential based on experience and education operates as a defense to liability, rather than as part of plaintiff's *prima facie* case).

salary of $110,000. Defendants offered him $105,000, which McNamara accepted, joining defendants' employ in June 2002. Defendants contend that plaintiff presented no evidence at trial rebutting the evidence that defendants paid McNamara more because of his background and previous salary, and that therefore they are entitled to judgment as a matter of law on plaintiff's pay claim under the EPA.

Under the EPA, however, defendants have both the burden of production and persuasion; thus defendants must persuade the jury, by a preponderance of the evidence, of the validity of their nongender-based explanation for a wage differential. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974) (noting that, after plaintiff shows that employer pays workers of one sex more than workers of the opposite sex for equal work, burden of proof shifts to employer to show that pay differential is justified under one of the EPA's four exceptions). And, in this respect, plaintiff offered evidence to rebut defendants' claim that the pay difference was due to a factor other than sex. Specifically, plaintiff presented evidence through the testimony of Nitsche, the department manager, that would allow a reasonable jury to infer that if the market required defendants to pay more to hire someone from outside the company, defendants would raise the salaries of those already working in the company to compensate. *See* Tr. Vol. 2 at 252. Yet, this did not occur. Moreover, Nitsche had testified at his deposition that marine engineering was "not a hot area in the business field" that required offering higher salaries to entice outsiders. Thus, the jury could reasonably have concluded that defendants asserted reason for paying McNamara more was not the true reason.

It is true that plaintiff did not rebut defendants' evidence on McNamara's edu-

cational background and experience. Yet, plaintiff did present evidence of her own educational background and experience. As discussed earlier, plaintiff has extensive experience as a chemist, materials engineer, and physical scientist, including almost nine years of experience at BBN itself. She also holds a master's degree in business administration, specializing in program management. Moreover, the trial record is replete with evidence that plaintiff is an exceptional and valued employee with a proven record of attracting new business to BBN and satisfying her customers. From this evidence, a reasonable jury could conclude that McNamara's education and experience was not more valuable than plaintiff's and thus could not serve to explain or justify the pay differential between them.

█ In summary, while defendants' asserted justifications for paying McNamara at a higher rate are not without record support, there is also evidence to the contrary and defendants' evidence does not "rise to such an overwhelming level that no reasonable jury could find that the pay differential was unjustified." *Fowler v. Land Management Groupe*, 978 F.2d 158, 161 (4th Cir.1992). As a result, defendants are not entitled to judgment as a matter of law or a new trial on the issue of liability under the EPA.

### B. The Title VII Claims

Defendants challenge the jury's verdict on both plaintiff's Title VII pay disparity claim and her Title VII raise claim. With respect to plaintiff's Title VII pay claim, defendants first argue that plaintiff failed to exhaust her administrative remedies because plaintiff's charge of discrimination filed with the EEOC does not contain any allegations that she was paid a salary different from that paid to McNamara; indeed, they point out, McNamara did not

become an employee of defendants until two and a half months after plaintiff filed her EEOC charge.

It is true that before a plaintiff has standing to file suit under Title VII, she must first exhaust her administrative remedies by filing a charge with the EEOC. *See Bryant v. Bell Atlantic Md., Inc.,* 288 F.3d 124, 132 (4th Cir.2002). And, it is also true that "[t]he EEOC charge defines the scope of the plaintiff's right to institute a civil suit." *Id.* An administrative charge of discrimination, however, does not strictly limit the Title VII suit that follows; instead, " 'the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination.' " *Id.* (citation omitted). Put another way, "claims and bases of discrimination set forth in a Title VII complaint 'are cognizable as long as they are like or reasonably related to the allegations of the charge and grow out of such allegations.' " *Nicol v. Imagematrix, Inc.,* 767 F.Supp. 744, 753 (E.D.Va. 1991) (citation omitted).

Plaintiff's EEOC charge alleges, *inter alia,* that plaintiff's supervisor, Miner, "treated [her] differently than [her] male coworkers" and that she "complained to Human Resources ... about not being treated equally to [her] male co-workers." In addition, plaintiff's charge alleges that she "did not receive the average raise of 4% like [her] similarly situated male co-workers, even though [she] brought in more business for the company then [sic][her] male co-workers." A reasonably thorough EEOC investigation of this general disparate treatment allegation would surely encompass whether she was paid less than similarly-situated male co-workers. *See Bryant,* 288 F.3d at 132 (scope of civil action confined by scope of EEOC investigation that can reasonably be expected to follow EEOC charge). That

McNamara was hired after plaintiff filed her EEOC charge is not dispositive; there were other candidate comparators. Moreover, McNamara was hired a mere two and a half months after plaintiff filed her EEOC charge. Given the typical processing time, any EEOC investigation into the matter likely would not have commenced until after McNamara was hired. In addition, the allegations in plaintiff's charge suggest continuing disparate treatment because plaintiff continued to work as defendants' employee under the same management after filing her EEOC charge and it is likely that the EEOC would ultimately have included her claim concerning McNamara. Since plaintiff's disparate pay claim is a reasonably related outgrowth of her EEOC charge, and because her charge suggests continuing discrimination, the allegations in the charge sufficiently form a basis for plaintiff's claim at trial that she was paid less than McNamara. *Cf. Patterson v. General Motors Corp.,* 631 F.2d 476, 483 (7th Cir.1980), *cert. denied,* 451 U.S. 914, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981) (EEOC charge that does not suggest continuing discrimination cannot form the basis for a complaint that alleges discrimination not occurring at the time covered by EEOC charge).

Next, defendants argue that, as with her EPA claim, plaintiff failed to establish a *prima facie* case for her Title VII pay claim because, as an employee who works a reduced schedule of thirty hours per week, plaintiff is not similarly situated to McNamara, who works forty hours per week.

A plaintiff may assert claims based on unequal pay for equal work under both the EPA and Title VII. *See Brinkley–Obu v. Hughes Training, Inc.,* 36 F.3d 336, 343 (4th Cir.1994). Under Title VII, a plaintiff can establish a *prima facie* case "by demonstrating that she is female, i.e., a member of a protected class,

and that the job she occupie[s][is] similar to higher paying jobs occupied by males." *Id.* at 343. The primary difference between EPA and Title VII claims is that under Title VII " 'there is a relaxed standard of similarity between male and female-occupied jobs, but a plaintiff has the [ultimate] burden of proving intent to discriminate on the basis of sex.' " *Id.* (citation omitted). As previously discussed, plaintiff produced sufficient trial evidence from which a reasonable jury could conclude that she performed substantially equal work as McNamara under the EPA. Because the standard of similarity under Title VII is less stringent than the standard under the EPA, it necessarily follows that plaintiff also adduced sufficient trial evidence from which a reasonable jury could conclude that plaintiff and McNamara are similarly-situated employees under Title VII. As a result, plaintiff did not fail to establish a *prima facie* case with respect to her Title VII pay claim.

Defendants also contend, however, that plaintiff did not adequately rebut the legitimate, nondiscriminatory reasons advanced for the pay disparity between plaintiff and McNamara. While the EPA places the burden of production and persuasion on defendants to show that a wage differential is based on a factor other than sex, a different rule obtains under Title VII: "[T]he plaintiff's prima facie case serves to shift only the burden of production to the defendant." *Brinkley–Obu,* 36 F.3d at 344. Also, discriminatory intent is not an element of an EPA claim. *Id.* at 344 n. 17. Given these differences, "a plaintiff may succeed on an Equal Pay Act claim and fail to establish a Title VII claim." *Id.* Under Title VII, after the defendant produces a legitimate nondiscriminatory reason for the pay disparity, "the burden of persuasion remains on the plaintiff to demonstrate that the proffered explanation is pretextual and that the defendant was actually motivated by discriminatory intent."

*Id.* at 344; *accord Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). This showing may be made directly by showing that a discriminatory reason more likely motivated the employer or indirectly "by showing that the employer's proffered reason is unworthy of credence." *Brinkley–Obu,* 36 F.3d at 344.

As discussed earlier, viewed in the light most favorable to plaintiff, Nitsche's trial and arguably conflicting deposition testimony could have led a reasonable jury to discredit defendants' proffered explanation for paying McNamara more than plaintiff. And, in this respect, it is settled that "rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (emphasis in original); *accord Reeves,* 530 U.S. at 143, 120 S.Ct. 2097 ("[P]laintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.' "). Moreover, plaintiff presented evidence at trial that she, as the sole female in her group, was the only employee not provided with a laptop computer, although she had repeatedly requested one for several years. Additionally, she showed that she received the smallest number of billable hours from her supervisors and colleagues, although she generously provided her coworkers with billable hours on her projects. As a result, plaintiff presented sufficient evidence from which a reasonable jury could infer that defendants discriminated against her on the basis of sex by paying McNamara more than plaintiff.

Next, defendants attack the Title VII raise claim, arguing that they are entitled to judgment as a matter of law because a lower than expected pay raise is

not an adverse employment action. Under Title VII, it is "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual" or to discriminate "with respect to his compensation, terms, conditions, or privileges of employment" because of an individual's sex. 42 U.S.C. § 2000e–2; *Taylor v. Virginia Union University*, 193 F.3d 219, 230 (4th Cir.1999). As part of her *prima facie* case at trial, plaintiff was required to prove that she was subjected to an adverse employment action. *See King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir.2003) (listing "adverse employment action" as an essential element in plaintiff's *prima facie* case under Title VII). Discharge, demotion, decrease in compensation, loss of job title or supervisory responsibility, and reduced opportunities for promotion are examples of typical adverse employment actions. *Boone v. Goldin*, 178 F.3d 253, 255–56 (4th Cir.1999).

While it appears that the denial of a pay increase may constitute an adverse employment action under Title VII,[12] plaintiff cannot claim she was denied a pay increase in 2002. Instead, she readily concedes, as she must, that she received a 1.36% pay increase. Moreover, the record also reflects that, in addition to her 1.36% pay raise, plaintiff received $8,967 in incentive pay for 2002.[13] As a result, defendants increased plaintiff's overall compensation for 2002 by $9,967. At its core, therefore, plaintiff's Title VII raise claim is that she is not satisfied with her 2002 pay raise. In other words, plaintiff concedes that in receiving the pay raise she received a benefit, but she thinks she should have received an even greater benefit.

Absent a very large disparity between the raise given a claimant and the raises given to valid comparators, which is not the case here, "it is difficult to see how a raise in one's salary could constitute an *adverse* employment action."[14] *Milligan v. Citibank*, No. 00–2793, 2001 WL 1135943, **4–5, 2001 U.S. Dist. LEXIS 16105, at *11–12 (S.D.N.Y. Sept. 26, 2001) (emphasis in original); *see also McCann v. Fairfax County Gov't*, 32 F.Supp.2d 365, 368 (E.D.Va.1998) ("A pay increase obviously is a benefit, not an adverse action.").

This is not to say, however, that receiving a lower raise can *never* constitute an adverse employment action. There may be situations where low pay raises are so consistent or their monetary significance in proportion to salary so substantial that they rise to the level of an adverse employment action. *See, e.g., Saleh v. Upadhyay*, 11 Fed. Appx. 241 (4th Cir.2001) (unpublished).[15] In this case, however, plaintiff's receipt of a 1.36% pay raise plus incentive pay amounts, at most, to a failure to receive an additional $3,410.[16] While this figure is by no means

---

**12.** *See Flateau v. South Carolina Comm'n for the Blind*, 50 Fed. Appx. 653, 654 (4th Cir. 2002) (unpublished) ("To establish her [Title VII] claim, [plaintiff] was required to demonstrate that she was denied a pay increase because of her gender.").

**13.** The record reflects that McNamara received no incentive pay for 2002, and that others, such as John Lechmanik, Steve Lutgen, and Matthew McMurtry, received $8,882, $10,321, and $6,588, respectively, in incentive pay for 2002. Plaintiff does not argue that she was in any way discriminated

against with respect to, or dissatisfied with, her 2002 incentive pay.

**14.** For example, if an employer were to grant an employee a minimal raise of say only $100, while granting her valid comparators raises in excess of $10,000, such action may cross the adverse employment action threshold.

**15.** For a detailed discussion of the facts in *Saleh*, see *infra* note 17.

**16.** This figure assumes plaintiff would have received a 6% raise. Testimony at trial revealed that the average raise for an employee

inconsequential, it does not rise to the level of an adverse employment action. This follows from the sensible principle that "[e]very employment decision that arguably has a negative impact on an individual does not rise to the level of an adverse employment action." *Stringfield v. Christopher Newport Univ.*, 64 F.Supp.2d 593, 598 (E.D.Va.1999) (citations and quotations omitted). To conclude otherwise would allow employees disappointed over not receiving a higher raise to invoke Title VII to require courts to become involved in the messy business of evaluating employees and making finely-tuned raise determinations. There is no warrant for allowing Title VII to be used in this manner because the magnitude of the raise differential in this case cannot be said to have "*adversely* affected the terms, conditions, or benefits of the plaintiff's employment."

*Von Gunten v. Maryland,* 243 F.3d 858, 865 (4th Cir.2001) (emphasis added). To be sure, a lower than expected pay raise concerns a term, condition, or benefit of employment. But where, as here, plaintiff receives a non-trivial raise and incentive pay resulting in a significant *increase* in her compensation, her pay raise does not *adversely* affect the terms, conditions, or benefits of her employment. As a result, plaintiff failed to establish a *prima facie* case for her Title VII raise claim and defendants are thus entitled to judgment as a matter of law in this regard.[17] *See Price v. City of Charlotte,* 93 F.3d 1241, 1249 (4th Cir.1996) ("The movant is entitled to judgment as a matter of law 'if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof.'" (citation omitted)).[18]

with a overall rating of "High Standard" was between four to six percent.

17. Plaintiff's reliance on the Fourth Circuit's unpublished decision in *Saleh v. Upadhyay,* 11 Fed. Appx. 241 (4th Cir.2001), for the proposition that a lower pay raise is an adverse employment action under Title VII is unavailing. Putting to one side that unpublished decisions lack precedential value, *see In re Members Warehouse, Inc.,* 991 F.2d 116, 119 n. 2 (4th Cir.1993) (noting that "an unpublished decision has no precedential value"), it is worth noting several material distinctions between *Saleh* and this case. Plaintiffs in *Saleh* received the lowest raises in their respective departments for three years in a row and, as a result, one plaintiff suffered lost earnings calculated at between $56,767.00 and $113,075.00. *Saleh,* 11 Fed. Appx. at 257. It was in this context that the panel found that "the reduction of Saleh's raises *for three years in a row* constitutes an adverse employment action that may be expected to chill an employee's First Amendment rights." *Id.* (emphasis added) Indeed, it is significant that this issue arose in the context of a First Amendment retaliation claim where, as the panel specifically noted, "something less onerous than an 'adverse employment action' in the context of Title VII jurisprudence may so chill the exercise of constitutional rights as to

constitute a showing of adversity in a First Amendment retaliation case under § 1983." *Id.* at 255. While it is true that the panel also apparently considered the other plaintiff's (Mbagwu) low pay raises an adverse employment action, without discussion, in the context of his § 1983 national origin discrimination claim, the fact remains that Mbagwu also received consistently low raises for three years in a row, which produced alleged losses that are an order of magnitude beyond the alleged loss in this case. *See id.* at 258–59. *Saleh,* therefore, differs significantly from this case in several respects.

18. Pursuant to Rule 50(c)(1), Fed.R.Civ.P., defendants' motion for a new trial on plaintiff's Title VII raise claim must be conditionally denied. If, on appeal, the Fourth Circuit determines that a 1.36% pay raise constitutes an adverse employment action in this context, it is clear that plaintiff established a *prima facie* case for her Title VII raise claim. There is evidence in the record that the average raise for employees with a "High Standard" rating was between four to six percent. Moreover, the jury could have reasonably concluded that defendants' proffered reason for the 1.36% pay raise—namely plaintiff's improper purchase requisition—was pretextual, as plaintiff testified that she had always followed the same

## C. Damages

The jury awarded plaintiff $325,000 in compensatory damages on her Title VII claims. Defendants argue that the issue of compensatory damages should not have been submitted to the jury because plaintiff failed to present any evidence of her alleged compensatory damages at trial. Before reaching the merits of this argument, it is necessary to note that an award of damages for a violation of Title VII in these circumstances may not exceed $300,000.[19] *See* 42 U.S.C. § 1981a.[20] Therefore, as a preliminary matter, the jury's award of compensatory damages must be reduced to $300,000.

In response to defendants' argument that plaintiff did not present any evidence to support an award of compensatory damages, plaintiff points to the following evidence presented at trial: (1) a letter plaintiff wrote to Human Resources in which she states that she "is the only female in the group; however, that should not exclude [her] from being respected and recognized as an equal to the male members of the group;" (2) other documents in which plaintiff complains of being excluded from being an "active participant" in the group's programs, including a training session; (3) defendants' failure to provide her with a laptop computer; (4) testimony and other documentary evidence that her male co-workers and supervisor failed to provide her with billable work on their projects and thus forced plaintiff to spend non-billable time marketing for billable work; (5) testimony that Gauthier assigned hours to others on plaintiff's programs without informing her; (6) e-mails from plaintiff to the Materials subgroup in which she asked her male co-workers to stop charging to her programs without doing work on them; and finally (7) the underlying evidence that defendants' discriminated against plaintiff.

 None of plaintiff's proffered evidence is sufficient to support an award of compensatory damages in this case. The instructions given to the jury on compensatory damages stated, in relevant part:

You may award compensatory damages only for injuries that plaintiff proves were caused by defendants' alleged wrongful conduct. The damages that you award must be fair compensation—no more and no less. You may award damages for any pain, suffering or mental anguish that plaintiff experienced as a consequence of defendants' allegedly unlawful act.

A review of the record as a whole reveals that plaintiff failed to present any evidence at trial of her alleged compensatory damages. Counsel did not ask plaintiff a single question concerning how she felt

---

procedure for purchase requisitions and had never been reprimanded before. In addition, a jury could reasonably find defendants' justification unworthy of credence since Nitsche initially offered a different reason for the 1.36% raise at his deposition, namely that plaintiff's raise was not increased after her overall performance evaluation was changed to "High Standard" because the compensation system was closed.

**19.** Indeed, plaintiff concedes this point in her opposition brief.

**20.** Section 1981a of Title 42 states in relevant part:

The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, *shall not exceed*, for each complaining party—... (D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding year, *$300,000.*

42 U.S.C. § 1981a (emphasis added).

about being paid less than McNamara. Indeed, plaintiff did not articulate any mental anguish she suffered or any instances of emotional injury. This utter lack of evidence simply cannot support the award of compensatory damages in this case. *See Price v. City of Charlotte*, 93 F.3d 1241, 1255 (4th Cir.1996) (holding plaintiffs' vague and conclusory evidence insufficient to support an award of compensatory damages).[21] As a result, the issue of compensatory damages should not have been submitted to the jury and defendants are entitled to judgment as a matter of law on this issue. Therefore, the jury's award of $300,000 in compensatory damages must be vacated.[22]

Defendants also challenge the jury's award of $75,000 in back pay under Title VII and $100,000 under the EPA as excessive. Before the start of their deliberations, the jury was instructed on awarding and calculating back pay damages under Title VII as follows:

> If you determine that defendants discriminated against plaintiff on the basis of her sex then you must determine the amount of damages that their actions have caused plaintiff. You may award as actual damages an amount that reasonably compensates plaintiff for any lost wages taking into consideration any increases in salary that plaintiff would have received had she not been discriminated against.

The jury was also instructed regarding the proper measure of damages under the EPA:

> You should find as damages to be awarded in favor of plaintiff the amount of money that will compensate her for the difference between what she has been paid by defendant and what a male employee was paid for performing a job requiring substantially equal skill, effort, and responsibility that was performed under similar working conditions.

Plaintiff's comparator was Charles McNamara. In calculating a back pay award in these circumstances, "the female employee should be awarded the difference between what she was paid and what the comparable male employee was paid." *EEOC v. Liggett & Myers Inc.*, 690 F.2d 1072, 1076 (4th Cir.1982).[23]

██ Testimony at trial revealed that the one year salary differential between

---

**21.** In *Price*, the plaintiffs presented testimony at trial that, *inter alia*, the individual plaintiffs felt "betrayed," "disappointed and embarrassed," "devastated," "used as a pawn," "slapped in the face," and that they experienced stress. 93 F.3d at 1255. The jury awarded each plaintiff $3,000 in compensatory damages. *Id.* While recognizing that a plaintiff's testimony alone could support an award of compensatory damages, the court found that such testimony must "establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated" and that the testimony cannot rely on "conclusory statements that the plaintiff suffered emotional distress" or the mere fact that the plaintiff was wronged. *Id.* at 1254; *see also Bryant v. Aiken Regional Medical Centers, Inc.*, 333 F.3d 536, 546–47 (4th Cir. 2003). Instead, the testimony must indicate with specificity "how [the plaintiff's] alleged distress manifested itself." *Price,* 93 F.3d at 1254. In stark contrast to the *Price* plaintiffs,

plaintiff here failed to present *any* evidence of emotional distress.

**22.** Pursuant to Rule 50(c)(1), Fed.R.Civ.P., defendants' motion for a new trial on the issue of compensatory damages must be conditionally granted. As plaintiff did not put forth *any* evidence to support an award of compensatory damages, it necessarily follows that the jury's $300,000 award was manifestly against the clear weight of the evidence.

**23.** The cases plaintiff relies on to argue otherwise are inapposite because this is *not* a case where "the resulting injury is not capable of precise measurement." *Hairston v. McLean Trucking Co.*, 520 F.2d 226, 233 (4th Cir. 1975) (class action case where court noted that "[c]lass actions for back pay under Title VII are inherently complex; the computation of individual awards necessarily involves speculation: what the plaintiff's would have received but for discrimination"). Nor is this

plaintiff ($103,333 annualized) and McNamara ($107,500) was $4,167. Once plaintiff's reduced schedule is taken into account, however, calculation of her salary at McNamara's rate of pay reveals that her 2003 salary would be $80,625; or $3,125 more than her current 2003 salary of $77,500. The jury's actual award of $175,000 in economic damages bears no rational or reasonable relationship to the damages proved at trial.[24] As a result, this damage award must be reduced, to $3,125, plus interest.[25] Defendant's motion for a new trial pursuant to Rule 59(a) on the issue of back pay damages therefore must be granted *nisi remittitur*. Thus, in the event plaintiff does not accept this remittitur in the back pay damage award, defendants are entitled to a new trial on this issue. *See Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir.1998) ("Remittitur, which is used in connection with Fed.R.Civ.P. 59(a), is a process, dating back to 1822, by which the trial court orders a new trial unless the plaintiff accepts a reduction in an excessive jury award.") (internal quotation marks omitted).

### III.

To sum up, defendants' motion for judgment as a matter of law pursuant to Rule 50(b), Fed.R.Civ.P., or in the alternative for a new trial pursuant to Rule 59(a),

Fed.R.Civ.P., must be denied with respect to plaintiff's EPA claim and Title VII pay claim. Defendants motion for judgment as a matter of law, however, must be granted with respect to plaintiff's Title VII raise claim and the jury's award of compensatory damages under Title VII. Finally, the jury's award of economic damages for back pay under Title VII and the EPA was excessive. As such, defendants' motion for a new trial pursuant to Rule 59(a), Fed.R.Civ.P., must be granted, *nisi remittitur*. Should plaintiff accept remittitur, the jury's back pay award must be reduced to $3,125, plus interest.

An appropriate order will issue.

a case where plaintiff made her *prima facie* case "by comparing her salary to that of her predecessor or successor." *Brinkley–Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir.1994). Plaintiff's comparator was her co-worker, Charles McNamara, and the wage differential between them is readily quantifiable.

24. While the jury also found for plaintiff on her Title VII raise claim, because defendants are entitled to judgment as a matter of law on this claim, plaintiff is no longer entitled to damages on this claim. In any event, had plaintiff received a 6% raise rather than a 1.36% raise, she would have received $4,410,

rather than $1,000, and would thus be entitled to $3,410 in damages for her raise claim. This certainly does not alter the conclusion that the jury's economic damage award was excessive.

25. Plaintiff is not entitled to recover damages under both the EPA and Title VII for her pay claim because defendants' liability under both statutes in this case is premised on the same wrong. *See* 29 C.F.R. § 1620.27(b) ("Recovery for the same period of time may be had under both the EPA and Title VII *so long as the same individual does not receive duplicative relief for the same wrong.*" (emphasis added)).